**Helen MATJE, et al., Plaintiffs,**

v.

**Simon LEIS, et al., Defendants.**

**Civ. A. No. C–1–82–351.**

United States District Court,
S.D. Ohio, W.D.

Sept. 12, 1983.

---

Alphonse A. Gerhardstein, Cincinnati, Ohio, for plaintiffs.

Brian E. Hurley, Asst. Pros. Atty., Jerry F. Luttenegger, Asst. City Sol., Cincinnati, Ohio, for defendants.

Daniel B. Mulholland, Cincinnati, Ohio, for Jean Chenault.

## OPINION AND ORDER

SPIEGEL, District Judge:

Now before the Court in this civil rights case are a number of motions to dismiss or, in the alternative, for summary judgment. These include the motion of defendants Simon Leis, Richard Taylor, Hamilton County, and the Regional Enforcement Narcotics Unit (RENU) (doc. 34), plaintiffs' response thereto (doc. 45) and related documents (docs. 51, 55, 59, 61); the motion of defendant Paul Guthrie (doc. 60), plaintiffs' response (doc. 65) and defendants' supplemental memorandum (doc. 85); the motion of defendants Lincoln Stokes, Jack Bywater, and Hamilton County (doc. 35), plaintiffs' opposition thereto (doc. 59) and related documents (docs. 39, 40, 47, 51, 55, 59, 61); a motion on behalf of defendant Otto Roth (doc. 49) which is opposed (doc. 57); and a motion by defendant Jean Chenault (doc. 53) which is opposed (doc. 65). Several additional pending motions will be resolved in separate orders.

### I. Introduction

In this action under 42 U.S.C. § 1983, plaintiffs allege that their decedent's civil rights were violated, first when

defendants conducted an undercover narcotics investigation of her which resulted in her conviction on state criminal charges, and second, when inadequate supervision in the Hamilton County Jail resulted in her suicide. The defendants on the investigation claim move for summary judgment based upon contentions that the undercover activity in question was not under color of state law for purposes of § 1983, that they had no knowledge of the activities complained of, and that they have qualified immunity from liability because they acted in good faith. We hold that there are unresolved questions of material fact as to each of these contentions, and so deny the motions. The ruling is based upon plaintiffs' supported allegations that the undercover activity was under color of law as it was action taken by defendants' agents, that defendants had actual knowledge of the investigative tactics complained of, and that their entitlement to good-faith immunity is defeated by that knowledge. The investigatory activities complained of included use of sexual and physical intimidation, and providing drugs for undercover transactions. As to the jailhouse claim, defendants' motions are based on their lack of responsibility to prevent suicide in any case, their contention that the harm complained of did not result from execution of an official policy of supervisory personnel, but from an "isolated act of negligence," and their assertion of immunity from suit. Again, we conclude that the motions must be denied because there are unresolved questions of material fact as to the adequacy of jailors' training and the failure to promulgate appropriate policies or educate employees as to existing policies, which make summary judgment inappropriate at this time. Thus, all defendants' motions for summary judgment are denied.

## II. *Parties*

Plaintiffs in this case are Helen Matje and Linda Kien. They are the mother and sister of Kathleen Matje, now deceased. They seek compensatory and punitive damages for alleged violations of Kathy Matje's civil rights during a narcotics investigation and her subsequent imprisonment and suicide.

Defendants are as follows:

Hamilton County is a political subdivision of the State of Ohio. The Regional Enforcement Narcotics Unit is a police agency assembled under the auspices of the Hamilton County Commissioners. Its funding and personnel come from police departments throughout Hamilton County, including the Hamilton County Sheriff's Office and the Cincinnati Police Department. We have previously denied a motion to dismiss filed by RENU for failure to state a cognizable claim (docs. 4, 7).

Arthur Ney is the Hamilton County Prosecutor and the Director of RENU. He has been substituted for the former prosecutor, Simon Leis, insofar as Leis was sued in his official capacity.

Simon Leis is the former prosecutor and former Director of RENU. He is sued in his individual capacity only, as he has no continued connection with RENU.

Paul Guthrie is the Field Commander of RENU, as well as a Cincinnati Police Sergeant. He is sued in his official and individual capacities.

Richard Taylor is a Hamilton County Sheriff's Deputy and a former undercover narcotics agent working for RENU. He is sued in his official and individual capacities.

Louis Kahn was, at all relevant times, an undercover narcotics Special Operative Informant (SOI) employed by RENU to provide information regarding prospective targets for RENU investigations, and to assist with the investigation of those targets. Kahn worked both for money and "in consideration of" charges against him which pertained to serious narcotics offenses.

Lincoln Stokes is the Sheriff of Hamilton County and, as such, is responsible for the operation of the Hamilton County Jail. Jack Bywater is the Administrator of the Jail, Jean Chenault was a matron at the jail, and Otto Roth is a paramedic at the jail. All four are sued in their official and individual capacities.

### III. *Facts*

As noted, this case arises from the investigation, prosecution, and conviction of Kathy Matje on drug charges, and her subsequent imprisonment and suicide. All parties have extensively briefed and argued the various motions pending, and so we treat them as motions for summary judgment. Under Rule 56, Fed.R.Civ.P., summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Because all such motions in this case were filed by defendants, we must consider all of the materials listed in the Rule in the light most favorable to plaintiffs, as the non-moving parties, and the burden is on defendants to demonstrate their entitlement to summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Felix v. Young,* 536 F.2d 1126 (6th Cir.1976). In addition, the courts have uniformly held that summary judgment is inappropriate in certain categories of cases, notably those which involve sensitive civil rights issues of potentially substantial public import. Plaintiffs urge that this is such a case, and cite 10A Wright & Miller, *Federal Practice & Procedure* §§ 2732, 2732.2.

### A.

On November 20, 1981, Kathy Matje was convicted, after a bench trial in the Court of Common Pleas of Hamilton County, Ohio, of trafficking in a controlled substance (doc. 45, plaintiffs' response, at Exhibit A–2; doc. 26, amended complaint, at 4; *Ohio v. Matje,* Criminal No. B–812693 (Hamilton County Court of Common Pleas, November 20, 1981)). She had no prior criminal record. The conviction arose out of an investigation of Matje by RENU, through its agent Richard Taylor and its informant, Louis Kahn.

We have pieced the following facts together from the filings.

Matje first met Kahn in 1978. She was, at the time, a nursing student working at Cincinnati General (now University) Hospital as a clerk while Kahn was hospitalized for a gunshot wound. The two briefly dated after Kahn's discharge. They renewed their acquaintance in February of 1981, after a chance meeting.

Between 1978 and 1981, Kahn had begun working for RENU as a paid informant. He was also working in consideration of charges, that is, in return for a reduced charge or prosecutorial recommendation for leniency as to his own criminal conduct. In late March of 1981, Kahn contacted Taylor with information that Matje was involved in the sale of methaqualone. Taylor and Kahn subsequently went to Matje's apartment on two occasions in the Spring of 1981. According to Matje's testimony at her criminal trial, Kahn had asked her to keep a package of Quaaludes for him, and she had done so because he had begun to physically abuse her and she was frightened of him. She testified that when he came to her apartment with Taylor, he retrieved the pills and transacted business with Taylor in another room, having informed Matje that the transaction was part of his investigative activities for RENU. Taylor, on the other hand, has provided an affidavit averring that the transactions took place between himself and Matje, with Kahn involved only as a bystander.

Based upon these transactions, Matje was indicted by the Hamilton County Grand Jury. She was arrested on the charges on June 27, 1981 (doc. 45 at Exhibit A–5).

Between the date of her arrest and her trial, and probably in early September, 1981 (*see* doc. 34, Exhibit 1, affidavit of Simon Leis), certain allegations were brought to the attention of Leis by counsel for Matje. These allegations included the following: that Kahn had seduced Matje through the Spring of 1981; that the two had engaged in an intimate relationship which extended through the period during which the drug transactions occurred; and that Kahn had

either conducted the drug transactions himself, or had induced Matje to conduct them on his behalf.[1]

As a result of these allegations, an investigation of Kahn's conduct was commenced and he was removed from the rolls of paid RENU informants in late September of 1981 (doc. 34, Exhibit 1 at 2).

By this time, Matje had graduated from nursing school and was working as a registered nurse. She had, as noted above, no criminal record and was quite concerned over the prospect of being sent to prison. As a result of her fears, she made it known, as her trial date approached, that she would attempt suicide if she was sent to prison.

This information was passed along by friends of Matje's to her trial counsel, who informed the Hamilton County Sheriff's Office of his concern. At trial, a deputy was anonymously stationed in the courtroom to monitor Matje's behavior. We quote from the affidavit of trial counsel in the criminal action:

> As we prepared for trial, Kathy told me that her whole experience with Lou Kahn made her extremely upset. At one time she believed that she had a serious intimate relationship with Kahn. As it continued, he became more threatening and abusive toward her. While I worked with her from the summer of 1981 through her trial she continually maintained her innocence but she was clearly anxious and visibly shaken over the charges triggered by the actions of her former lover, Lou Kahn and the possibility of conviction for crimes she didn't do. As the trial approached Kathy became quite despondent.
>
> 3. One time prior to trial Kathy Matje told me she would try to bring a gun to court and shoot herself if convicted. She also expressed her deep fear of prison.
>
> 4. Several days prior to trial I received information from Bob Ashbacher [a friend of Matje's] and [plaintiff] Linda

Kien that Kathy Matje was seriously threatening suicide and that she would attempt to smuggle drugs into the jail behind a diaphragm in her vagina.

> 5. Shortly before the trial commenced I asked the constable, Richard Gibson, to provide a deputy sheriff to watch Kathy Matje during the trial.
>
> 6. A deputy, Chris Bauer, did arrive and sat behind my client during the entire trial.
>
> 7. After sentencing I informed the judge of the serious suicide threats . . . . Later, in the [Hamilton County] jail I told Chris Bauer that I believed Kathy Matje would try to take her life using a drug concealed behind her diaphragm. The deputy assured me that he would pass this information on to the jail staff.

(Doc. 38, plaintiffs' opposition, Exhibit A–1 at 2 (affidavit of David Parker, Esq.).)

Upon her transfer to the Hamilton County Jail, located upstairs from the courtroom where her trial took place, Matje was strip-searched by defendant Chenault. Chenault was acting upon information from the deputy who brought Matje into the jail "that this girl may have some drugs under her diaphragm" and that "she threatened suicide" (Chenault Deposition at 52–53). That information had also, prior to the search, been passed on to Chenault by Richard Weide, another deputy (id. at 54). According to Chenault, all incoming prisoners were strip-searched in 1981, but Matje was subjected to an additional strip-search because of the information regarding her suicide threats.

Chenault testified that she conducted the first search as follows:

> I made her take all of her clothing off and I checked her clothing. Then I made her turn around and examined the soles of her feet, then I made her turn around and spread the cheeks of her buttocks.

(Id. at 56). However, Chenault testified, she knew that a strip search would not

---

1. We are aware of no evidence before us at this time which delineates what Leis was told in September, and so have arrived at foregoing conclusions from other documents. We do not, of course, consider the parties bound by our description of the facts herein, but do believe that the above paragraph is a fair approximation of what occurred.

reveal whether or not Matje was wearing a diaphragm, and would not reveal the sort of contraband which had been reported as possibly being carried by Matje (*id.* at 57). Nonetheless, she neither reported that difficulty to the deputies involved nor asked Matje whether she was wearing a diaphragm or carrying contraband (tr. 57–58).

Matje was then instructed to put her street clothes back on, and was taken to the women's floor of the jail. There, another strip search, identical to the first, was conducted. Neither search included a body cavity examination. In force in November of 1981 was a policy guideline regarding such searches, promulgated by defendant Bywater in June of 1979, which provided that

> [a]s of this date, no manual inspection of any body cavity shall be performed on any inmate of the Hamilton County Jail unless:
>
> A) The correctional officer/Matron desiring the search has consulted with his/her immediate supervisor regarding the probable cause issue.
>
> B) Guidance concerning the procedure on (sic) that particular instance is obtained from the Jail Medical Staff.
>
> C) An appropriate witness to the procedure has been obtained.

(Chenault Deposition Exhibit 1). It was Chenault's understanding of this policy that, while "probable cause" is "[j]ust knowledge or suspicion that someone has something" (Chenault Deposition at 43), "we cannot do a manual body cavity search, that has to be done at the hospital" (*id.* at 33).

After the second strip search, Matje was turned over to defendant Otto Roth, it apparently being standard procedure to have new inmates speak with a paramedic before they are placed into the jail population. When Roth completed his interview, Chenault passed the information regarding Matje's suicide threat along to Roth. He asked Matje whether she was secreting any contraband. She denied it, and the subject was dropped.

Chenault testified that she thought she had told her supervisor about the suicide threat and the need for a body cavity search. However, no action was taken to procure such a search, and none was conducted.

After completion of the intake procedures, Matje was placed in a cell in the general prison population, as opposed to a cell adjacent to the matron's office which was equipped with a plexiglass window for constant observation and which, according to Roth, was used for potentially suicidal inmates (Roth Deposition at 33–37).

Matje was routinely observed throughout the late afternoon and evening of the twentieth, and, according to Chenault, was watched closely, meaning that she was looked in on "about every five minutes or so" (Chenault Deposition at 100). However, she was not placed on a "close watch," which is something ordered by the medical staff at the jail and which involved checking the prisoner every fifteen minutes and possibly keeping a log of the checks.

Sometime around 11:30 p.m. on the twentieth, Matje ingested a lethal amount of drugs and was pronounced dead shortly thereafter.

In addition to the foregoing facts, plaintiffs allege that Louis Kahn had, besides having seduced Matje, induced her to take illicit drugs, physically intimidated and abused her, forced her to engage in sex with another man while he watched, provided the drugs which were involved in the transactions with Taylor, carried a revolver, told Matje that he was allowed to use and sell drugs because he was a RENU agent, and otherwise engaged in what can only be characterized as gross misconduct. Many of these allegations are supported by affidavits from friends of Matje and from others who came into contact with Kahn during his tenure as a RENU informant (doc. 45 at Exhibits A–5—A–9). Plaintiffs also allege, via the affidavit of another young woman whom Kahn had "investigated," that defendant Leis had specific knowledge of allegations of misconduct by Kahn as

early as mid-1980. Specifically, that affidavit states as follows:

5. Because of Lou Kahn's earlier [sexual] advances and [drug-related] harassment, I doubted that he and Cliff George [Cincinnati police officer assigned to RENU as an undercover agent] were narcotics agents [as they had represented]. I spoke to my parents and we decided to complain to the [then] Hamilton County Prosecutor, Simon Leis and secure advice about how to handle the situation.

6. On August 26, 1980, I called Simon Leis with my parents on the line. I told Mr. Leis that Lou Kahn had been badgering me about buying and selling drugs through the summer; that I had seen him carry a gun; that he had asked me to go to Florida to buy drugs; that I was a nursing student when I met him and I didn't want to be harassed by him anymore. I explained that Lou Kahn and a person named Cliff George had recently identified themselves to me as narcotics agents; that they said they followed me, taken [sic] pictures and taped my telephone calls. I explained that they wanted me to arrange for them to buy drugs and that they threatened me with a felony arrest and conviction if I did not help them buy drugs.

7. Simon Leis said, "It sounds like you are running around with bad people. Tell them to go to hell."

8. Lou Kahn called me several days later. He was angry that I had called Simon Leis. I had not told him anything about my call to Mr. Leis. Lou Kahn knew that my mom and dad had been on the line with me and he knew the details of my statement to Mr. Leis.

(Doc. 45, Exhibit A–5 at 2–3).

The instant action was filed on March 31, 1982, seeking $2 million in compensatory damages and $2 million in punitive damages for the investigative activities of defendants RENU, Hamilton County, Leis, Guthrie, Taylor, and Kahn, for the negligent care allegedly given Matje at the Hamilton County Jail by defendants Roth, Chenault, and other unnamed and unknown jail personnel, and for the failure of defendants Bywater and Stokes to properly promulgate policies or train employees regarding the handling of potentially suicidal inmates.

## IV. *The Investigation Claim*

We note at the outset that we have previously ruled on a motion to dismiss by RENU (doc. 7, Order dated June 22, 1982). There, we held that RENU may properly be sued as an unincorporated association since plaintiffs are seeking to enforce "against it a substantive right existing under the Constitution or laws of the United States." Rule 17(b)(1), Fed.R.Civ.P. Nothing in defendant's motion persuades us that last year's ruling was inappropriate, and we decline to reconsider it at this time.

These defendants next argue that Kahn's alleged misconduct was not action "under color of" state law so as to bring it within the purview of § 1983.[2] The gist of their argument is as follows. First, they assert that it was proper to use informants, citing *Coffy v. Multi-County Narcotics Bureau,* 600 F.2d 570 (6th Cir.1979). Indeed, the *Coffy* panel concluded that

the use of undercover investigative techniques and procedures to collect evidence and apprehend persons involved in illegal drug transactions are all proper police activities that, standing alone, violate no federally protected rights of the suspects involved.

*Id.* at 579 (citation omitted). That being so, defendants assert, "[t]he plaintiffs must also establish that Kahn, while allegedly depriving Matje of her constitutional rights, was clothed with the authority of the state

---

**2.** Section 1983 provides

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

and was purporting to act thereunder" (doc. 34 at 8).

First, we are perplexed by defendants' assertion that Kahn must have been "purporting to act" under color of law in order for liability to attach. If they mean that a finding that actions were taken under color of law is contingent upon a threshold determination that the actor represented to those whose rights he allegedly infringed upon that he was an agent of the state, we disagree. Clearly, an undercover agent acts under color of state law—*i.e.,* is clothed with the authority of the state— when he conducts his investigations. *See generally Adickes,* 398 U.S. at 152, 90 S.Ct. at 1605 (private persons engaged in joint activity with state officials are acting under color of state law for § 1983 purposes); *Stengel v. Belcher,* 522 F.2d 438 (6th Cir.), *cert. granted,* 425 U.S. 910, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1975), *cert. dismissed,* 429 U.S. 118, 97 S.Ct. 514, 50 L.Ed.2d 269 (1976) (nature of act performed, not clothing of actor or duty status, determines whether action is under color of law). Under *Stengel* we perceive the issue of color of law as being, in this case, a question of fact for the jury, and one upon which defendants have not met their burden of showing that there is no disputed issue. We note in this regard that plaintiffs' affidavits aver that Kahn, while in the company of a RENU officer, represented that he was a police officer.

Defendants' primary argument is that plaintiffs cannot meet their burden because (1) Kahn knew and had a relationship with Matje prior to anyone at RENU ever having even heard Matje's name, let alone before the investigation of Matje was commenced; (2) Kahn, like all informants, was under RENU's control and direction only for those few occasions when he working [sic] directly with a RENU agent *and* following the agent's specific instructions. RENU did not and had no right to control any other aspect of the informant's life other than to make known to him that his relationship with RENU would not protect him from prosecution if he committed a criminal offense;

and (3) allegations made against Kahn were not made known to any of these defendants until *after* Matje was arrested.

(Doc. 34 at 9) (emphasis in original). Taking these as the mainstays of defendants' arguments against a finding that Kahn's actions were under color of law for purposes of this action, we find the first to be irrelevant, the second to be a questionable conclusion of law, and the last to be contradicted by plaintiff's evidence, and so a question for the trier of fact.

Defendants' assertion that Kahn's knowledge and "relationship" with Matje prior to the Spring of 1981 vitiates his acting under color of law is not compelling. All of Kahn's actions which are complained of took place after he was a RENU operative, and most occurred after the point at which Matje became a RENU suspect. Thus, we simply fail to see any significance in the prior acquaintance. If a policeman utilizes unlawful tactics in effectuating an arrest, the tactics are no more lawful because he was acquainted with the arrestee; we see no difference between that case and this.

However, even if the argument is noteworthy, there is no evidence as to the "prior relationship" except that the two dated each other a few times in 1978 after Kahn's release from the hospital. The informant's role is predicated upon his prior knowledge of potential suspects, according to defendants' own standards. Defendant Guthrie's affidavit states that

Before an individual is used as an informant, a RENU agent interviews the prospective informant. During the course of each such interview, the agent requires that the informant provide the following data:

a. General background information;

b. Complete identification;

c. His (her) criminal record;

d. His (her) familiarity with drugs;

e. His (her) familiarity with people who use and/or traffick in drugs.

(Doc. 34 at Guthrie Affidavit, ¶ 5). Thus, were this a valid defense, a factual question exists as to its appropriateness herein. It

would not further the ends of justice to conclude that the very factor which rendered the informant capable of service would also insulate those who select him from potential liability for his actions.

Defendants' second assertion—that Kahn "was under RENU's control and direction only for those few occasions when he working [sic] directly with a RENU agent *and* following the agent's specific instructions" —is simply a paraphrase of defendant Guthrie's stance on RENU's responsibility for its informants (*id.* at ¶ 6). It is also a conclusion of law, and one with which we are not able to agree for purposes of resolving these motions. The responsibility of an agency such as RENU and its executives for the alleged gross misconduct of informants such as Kahn is a subject which has not, as far as we can determine, received attention from the courts. However, relevant principles suggest that the matter is not as clear-cut as defendants urge.

In *Hays v. Jefferson County, Kentucky,* 668 F.2d 869 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982), the court considered whether police supervisors could be liable for negligent failure to train or supervise their subordinates. In concluding that they could not, the court held that, in seeking to establish liability in such situations,

> [a]t a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.

*Id.* at 874, *citing Leite v. City of Providence,* 463 F.Supp. 585 (D.R.I.1978) (a showing of at least implicit acquiescence is required to establish liability of superiors for torts of subordinates in § 1983 cases).

We do not overlook the significance of *Rizzo, Mayor of Philadelphia v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). There, the Court held that individual defendants in a § 1983 action were not subject to imposition of injunctive relief given a finding that none of them were personally responsible for the alleged deprivation. However, our holding today is premised

upon a finding that there are factual disputes as to whether or not defendants may be held personally responsible for the alleged deprivations. Thus, *Rizzo* does not militate in defendants' favor at this stage of the case. Of course, under *Rizzo* and its progeny, defendants will be entitled to an instruction that liability must be premised upon individual fault.

Defendants' position appears to be that by designating their undercover operatives as "informants," they are by virtue of that fact insulated from any liability for the consequences of whatever misconduct the informant might engage in.

The standard by which a § 1983 defendant's actions are to be examined in order to determine whether or not he acted under color of state law for purposes of the statute is, while flexible, fairly well defined. In *Lugar v. Edmondson Oil Company, Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) the Court expressly concluded that where a violation of rights occurs through state action, the violation occurs under color of state law for purposes of 1983. *Id.* at 941, 102 S.Ct. at 2756. *See also Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 ("no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be"). Under these cases, we have no difficulty in concluding that defendants have not demonstrated, on the record before us, that Kahn's actions were not actions under color of state law. The investigation of suspected violations of Ohio's controlled substances statutes is unequivocally a function of the state. While we need not address the question of whether all activities of informants, no matter how attenuated from their supervising officers, is state action and hence under color of state law, plaintiffs have sufficiently alleged a nexus between the actions of Kahn and tacit acquiescence or sanctioning of those actions by the RENU defendants to survive the instant motion.

In particular, plaintiffs have alleged, and supported with affidavits or with evidence

gleaned from RENU records, that a RENU suspect had informed Leis about activities of Kahn in his investigation of her which mirror those which he is alleged to have done in the Matje investigation; that Kahn had, while in the company of a RENU officer and in public, talked of being a police agent; that defendants utilized his services on a frequent, almost daily basis during the period in question; that Kahn was utilized as an informant despite defendants' knowledge of his involvement in substantial narcotics trafficking and manufacturing activities in derogation of defendants' own policy as to use of informants; and that defendants entrusted Kahn with large sums of money in order to purchase drugs for use in RENU investigations. These facts are, we hold, sufficient to create a substantial question of fact as to whether or not Kahn was acting under color of state law.

As an alternative basis for our conclusion that summary judgment is improper on this issue, we note that cases which have considered the position of informants in law enforcement activities appear to have uniformly considered the informants to be "agents" of the police. This lends credence to the assertion that their actions were under color of law.

In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Court rejected petitioner's argument that he had been entrapped by a government informant. The petitioner had alleged that the informant had tricked him into selling him heroin by providing him with the drug while telling him that he was actually being given a non-narcotic, counterfeit drug. While Justice Rehnquist's plurality opinion did not accept Hampton's version of the facts, it notes that

> [i]f the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.

*Id.* at 490, 96 S.Ct. at 1650 (citations omitted). Hampton contemplates the availability of effective procedures for redress of violations of civil rights to overzealous police agents of the state. Were we to hold that conduct such as that alleged here was not actionable under § 1983, we would effectively be holding that no matter how an informant conducted himself, no action could lie against those who are alleged to have, in effect, licensed his activities. Such a holding would in itself provide law enforcement officials with an incentive to adopt a "see no evil" approach to the use of informants. Such an approach would effectively legitimate a no man's land of investigative tactics, and we are unable to conclude that such legitimation is necessary or appropriate.

Our holding as to this point is reinforced by two recent cases from the Court of Appeals. In *United States v. Brown,* 635 F.2d 1207 (6th Cir.1980), the court considered appellant's entrapment defense where he claimed that he had been "set up" by a government informant who infiltrated a burglary ring of which he was a part. In its rejection of that defense, the court considered the actions of the informant and the FBI agents in the same breath, giving no indication that it believed the actions of the former to be any less attributable to the government than those of the latter. Similarly, in *United States v. Bowling,* 666 F.2d 1052 (6th Cir.1981), *cert. denied,* 455 U.S. 960, 102 S.Ct. 1475, 71 L.Ed.2d 680 (1982), an interstate transportation of stolen property case involving the same informant as did *Brown,* the court again gave no indication that it was unwilling to attribute all of the informant's activities to the government.

We do not, by our holding today, conclude as a matter of law that Kahn was acting under color of state law—we have no need to do so for purposes of the motion before us. We cannot, however, conclude as a matter of law that he was not so acting, and so decline to rule in defendants' favor on this issue.

928

In concluding that defendants have not met their burden of demonstrating that Kahn was not acting under color of state law, we are quite aware of the legitimate and often crucial role played by informants in the investigation of narcotics offenses. *Hampton,* 425 U.S. at 495 n. 7, 96 S.Ct. at 1652 n. 7 (concurring opinion of Justice Brennan); *Brown,* 635 F.2d at 1213. However, the cases are clear that governmental involvement in an investigation, through its undercover operatives, may become so outrageous as to offend notions of simple justice. *Hampton,* 425 U.S. at 495 n. 7, 96 S.Ct. at 1652 n. 7 (concurring opinion of Justice Brennan); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Plaintiffs allege, in essence, that such conduct has occurred here, and we cannot conclude that they should not be permitted to present their claim to the jury.

The foregoing commentary adequately considers defendants' suggestion that they are excused from potential liability because they did not know of Matje's allegations of misconduct until after her arrest. The evidence suggests that defendants knew of allegations of similar conduct by Kahn well in advance of the Matje investigation, and that is sufficient to withstand defendants' challenge on that point.

Movants next assert that Leis, Taylor and Guthrie did not participate in, encourage, or direct Kahn's alleged misconduct, and so could not be liable for any potential damages resulting therefrom. Our review of the cases persuades us that because there are substantial questions of fact material to the issue of what, if anything, these defendants actually knew about the alleged tactics of Kahn, and because we cannot, therefore, conclude that defendants have met their burden of demonstrating a lack of at least knowing acquiescence in Kahn's activities, summary judgment is improper on this issue at the present time.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court ruled that

government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738. The Court further noted that "[o]n summary judgment the judge may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Id.* at 818, 102 S.Ct. at 2739. If in fact plaintiffs' allegations as to defendants' knowledge as to Kahn's alleged conduct are borne out by the evidence, we consider the law in 1981 to have been no different as to the law today that such conduct could violate the constitutional rights of RENU suspects. Finally, the *Harlow* Court stated that

[b]y defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.

*Id.*

Defendants' position is apparently that they could in no event be liable for deprivations of Matje's civil rights unless they affirmatively instructed Kahn to commit the acts complained of. We do not perceive the matter as being so simple. We are not aware of a case in which the Supreme Court has addressed the subject of causes of action against public officials under § 1983 based upon failure to act to correct situations which they know may lead to constitutional violations. However, the law is clear in this Circuit and in this Court, as well as in at least one other Circuit, that liability may lie in such instances. We have already discussed, in relation to this point, *Hays,* 668 F.2d at 874, and *Leite,* 463 F.Supp. at

585. *See Bonsignore v. City of New York,* 683 F.2d 635 (2d Cir.1982) (City liable for failing to institute policy which would have led to identification of plaintiff's deceased, a police officer, as unable to safely carry a firearm where he shot plaintiff and then committed suicide.) Defendants' submissions completely overlook our decision in *Doe v. Burwell,* 537 F.Supp. 186 (S.D.Ohio 1982), where we held that

> a supervisory official's failure to act to correct harmful conditions which are substantially likely to violate a plaintiff's rights may constitute an implicit acquiescence in or approval of employee conduct resulting from those conditions.

(*Id.* at 188, *citing Hays,* 668 F.2d at 874).

In *Burwell,* we concluded that because there was a genuine issue of material fact as to whether or not the defendant Sheriff's role in a sexual battery upon a female inmate by a male jailor was one of simple negligence or a reckless failure to take corrective action of a situation likely to lead to a violation of plaintiff's rights, summary judgment was inappropriate. We believe that conclusion to apply with full force to the facts at bar. Thus, defendants' assertion that active encouragement or participation in Kahn's alleged misconduct is necessary to hold them liable is not persuasive, and summary judgment on that basis is denied.

■ The foregoing discussion largely disposes of defendants' argument that they are entitled to summary judgment on the issue of qualified immunity from liability. We note in addition that the burden of proving qualified immunity is squarely upon defendants, *Alexander v. Alexander,* 706 F.2d 751 (6th Cir.1983). For the reasons discussed above, we are far from able to conclude that this case presents an appropriate situation in which to hold that defendants' actions, if they constituted mis-

conduct, are covered by any form of immunity.

Concluding[3] that the motion of these defendants should be denied, we note that our present understanding is that the primary issues for resolution at trial will be: the extent and sufficiency of defendants' policies regarding use of informants; whether those policies were followed in the selection and continued utilization of Kahn as an SOI; and what knowledge defendants had or should have had regarding Kahn's alleged improper investigative tactics prior to the Matje prosecution. Plaintiffs have raised, and preliminarily supported, allegations of the most serious nature, and the way appears to be clear for trial of these issues.

## V. The Jail Claim

Defendants Lincoln Stokes, Jack Bywater, Jean Chenault, Otto Roth and Hamilton County have also moved for dismissal or summary judgment as to plaintiffs' claim that they were at fault in failing to properly handle Kathy Matje when she was turned over to them after her conviction on November 21, 1981. For the reasons set forth below, we conclude that summary judgment in favor of movants is inappropriate, and so deny their motion.

There are several steps to defendants' analysis. They first argue that a state prisoner has no constitutional right to protection against self-inflicted injury. Stokes, Bywater and the County next argue that even if there was some impropriety in the way in which Matje was processed, it was an "isolated act of negligence" and so not actionable under § 1983. They argue next that because the "isolated act of negligence" was not caused by implementation of its policies which caused an employee to violate Matje's rights, they cannot be liable.

---

**3.** In a supplemental memorandum filed well out of time (doc. 85, filed August 17, 1983; *see* Local Rule 4.0.2 S.D.Ohio (1981)) defendant Guthrie argues that he is immunized from exposure to liability in this case by virtue of 21 U.S.C. § 885(d) (1970). That section pertains to the *lawful* enforcement of narcotics laws.

While we agree that he would not be liable for such activities, the amended complaint and evidence raises questions as to the lawfulness of his activities. The statute has no relevance in such a situation. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339 (2d Cir.1972).

They also raise a number of issues which we consider collateral to those noted above, and which will be addressed as necessary.

To briefly recapitulate the facts relevant to the jail claim, Matje was convicted on state criminal charges on November 21, 1981. Prior to trial, Matje's counsel and, through him, court personnel had been apprised of the fact that Matje had threatened suicide, and had been informed that she planned to conceal depressants in her diaphragm to accomplish that end. She was strip searched, but a body cavity search, necessary to determine whether or not she had in fact used her diaphragm as a means of smuggling drugs into the jail, was never conducted. She was placed in a general population cell, although a cell was available which was designed for inmates who might attempt suicide, and although she was watched fairly closely, she nonetheless managed to carry through her threat and died that evening of a drug overdose.

■ It is clear that prison authorities have a constitutional duty to provide needed medical care for inmates. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Defendants acknowledge this general proposition, but submit that the duty does not extend to protecting inmates from themselves. While there is a certain appeal to their contention, it fails. Defendants omit from their discussion any mention of *Scharfenberger v. Wingo,* 542 F.2d 328 (6th Cir.1976). There, the court was faced with a case where a prisoner had been injured by injection with a drug provided him by the prison infirmary. The evidence was far from clear as to whether he had administered the injection to himself, or whether it had been done by the infirmary staff. The court noted that

> Defendants expend considerable effort seeking to prove that Scharfenberger injured himself. We regard this issue as irrelevant because a prisoner's custodians cannot lawfully deny him adequate medical care even in instance of deliberate self injury.

■ *Scharfenberger* thus narrows our inquiry considerably as it shows that, in a proper case, § 1983 liability may be predicated upon inadequate custodial care of an inmate who might harm herself. The relevant inquiry thus becomes the reasonableness of defendants' conduct in light of what they knew about Matje.

This is so because there is a "state of mind" requirement in an Eighth Amendment case. In *Estelle,* the Court held that the Constitution was violated by "deliberate indifference" to medical needs of prisoners. 429 U.S. at 104, 97 S.Ct. at 291. It has been held, and we agree for present purposes, that "deliberate indifference" exists when action is not taken in the face of "a strong likelihood, rather than a mere possibility" that failure to provide care would result in harm to the prisoner. *State Bank of St. Charles, Administrator, v. Camic,* 712 F.2d 1140, at 1146 (7th Cir.1983); *Vun Cannon v. Breed,* 391 F.Supp. 1371 (N.D.Cal.1975).

It is in this context that we view the instant motions. We consider the motions of Chenault and Roth first. Taking the allegations of the amended complaint and the evidence before the Court, including these defendants' depositions, most favorably to plaintiffs, these two defendants had full knowledge of Matje's suicide threat as well as knowledge that their standard procedures could not determine whether or not she had the means available with which to carry out that threat. They nevertheless took no substantial steps to assure that she would not or could not do so. The depositions of both defendants tend to support this conclusion. The motions of Chenault and Roth are therefore denied.

While the motion of the County, Stokes, and Bywater raises more substantial questions, we conclude that they have not met their burden of demonstrating that no question of material fact exists as to their potential liability, and so we deny their motion.

The primary basis for their motion is that they had no personal knowledge of Matje's suicide threat prior to her death, that there was no failure of policy or training as to their subordinates, and that they cannot,

therefore, be held liable for what they term "isolated acts of negligence" committed by their subordinates.

Plaintiffs allege, with regard to these defendants that they "willfully, recklessly and/or negligently hired, supervised, and retained jail personnel poorly trained and educated for their duties and failed to train them further as to the proper, most humane and safest methods for carrying out their duties." While not certain that defendants must use the "most humane and safest methods" of dealing with prisoners, we nonetheless conclude that, for present purposes, plaintiffs have provided sufficient support for their contention that Matje was recklessly cared for, to withstand defendants' motion.

■ Much of plaintiffs' response to this motion is devoted to analysis of learned treatises regarding when suicide threats should be taken seriously; defendants respond to this by moving to strike all such references because they improperly utilize the treatises. We do not delve into the intricacies of either the psychiatric or the evidentiary arguments made by the parties, the former being a matter for expert testimony at trial and the latter being therefore irrelevant at this time. We conclude for present purposes that where an inmate known to have substantial medical training has threatened suicide by a feasible mode and those threats have been made known to the jail personnel, those personnel cannot disregard the threats and must treat the inmate as a potential suicide.

That brings us to consideration of defendants' policies regarding handling of suicidal prisoners.

We have no doubt that Matje's case presented "probable cause" for conducting a body cavity search under defendants' policy regarding such searches, see ante at 929, and defendants so concede (doc. 35 at 24–25). That policy, however, was poorly understood, or not known, by jail personnel. The policy does not state that such searches can only be conducted at the hospital, yet that was Chenault's understanding of it. The policy states that medical personnel

will be consulted regarding methods to be used in such searches, yet defendant Roth, a member of the medical staff, was wholly unaware that the policy even existed until after Matje killed herself. Chenault was aware of no procedure for effectuating such searches once she made a probable cause determination. These facts lead us to conclude that, for purposes of this motion, plaintiffs have stated a claim of sufficiently negligent training of jail personnel to withstand the instant motion. While it is true that it was the concededly improper *execution* of the body cavity search policy which caused the problem here, *Hays,* applies here as well to permit liability to attach to the claim of a gross failure to adequately train, *i.e.,* to nonfeasance. 668 F.2d at 874; *Burwell,* 537 F.Supp. at 188. We have no evidence at this time which permits a distinction between Stokes and Bywater insofar as establishment and implementation of training is concerned, and so decline both defendants' invitations to grant judgment in their favor. Again, we anticipate that the proof at trial will include delineation of the roles of each individual.

Defendants' "isolated acts of negligence" contention simply raises a question of fact to be resolved at trial. We cannot at this point conclude that the death of Kathy Matje, if facilitated by negligence on the part of any defendant, was facilitated by that of Chenault and Roth in improperly executing policies, as opposed to that of the supervisory defendants to ensure that their subordinates were properly informed as to jail policies regarding prisoners who presented suicide or contraband threats.

## VI.

■ The foregoing demonstrates that there are a number of critical areas of factual disagreement which render summary judgment inappropriate at this time on either the investigation count or the jail count of the amended complaint. However, we note, as an additional basis for denying summary judgment in this case, that a number of cases have denied such motions in accordance with the principle that summary judgment motions should be viewed with particular caution where civil rights

**932**

violations are involved. *See e.g., Halperin v. Kissinger,* 606 F.2d 1192, 1209 (D.C.Cir. 1979), *aff'd per curiam* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981), *Askew v. Bloemker,* 548 F.2d 673, 679 (7th Cir.1976); *Smith v. Jordan,* 527 F.Supp. 167, 170–71 (S.D.Ohio 1981) (Rice, J.). This case raises substantial questions as to the propriety of actions taken by individuals involved with the police, as well as to the nature of that involvement. It also raises substantial questions of fact as to the adequacy of training and procedure at the Hamilton County Jail. Thus, we do not perceive it as an appropriate case for resolution on the pleadings.

We do not at this time address defendants' arguments that the Court should decline to exercise our discretion to accept pendent jurisdiction over plaintiffs' state law claim seeking injunctive relief to correct alleged misspending of public monies, since that issue is relevant to plaintiffs' motion to amend their amended complaint to add those claims. That issue will be addressed in a forthcoming order.

*Conclusion*

The Court having determined that there are substantial questions of material fact as to each movant for summary judgment in this case, all such motions are hereby denied.

SO ORDERED.