853 F.2d 1111
 Albert FREEDMAN, Administrator of the Estate of Jerry
Freedman, Albert and Estelle Freedman, Appellants,
v.
CITY OF ALLENTOWN, PENNSYLVANIA, David M. Howells, Sr.,
Gerald Monahan, Jr., Carl Balliet, George LaFaver,
Robert Hendricks, and Frank Kroboth.
 No. 87-1070.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 3, 1988.
Decided Aug. 10, 1988.
 
 Richard N. Shapiro (argued), Philadelphia, Pa. (Peter Goldberger, Philadelphia, Pa., of counsel), for appellants.
 Alan M. Black (argued), Daylin B. Leach, Black, Epstein, Prokup and McCarthy, Allentown, Pa., for appellees City of Allentown, Pennsylvania, David M. Howells, Sr., Gerald Monahan, Jr., Carl Balliet, George LaFaver, and Robert Hendricks.
 LeRoy S. Zimmerman, Atty. Gen., Amy Zapp (argued), Deputy Atty. Gen., John G. Knorr, III, Sr. Deputy Atty. Gen., Andrew S. Gordon, Chief Deputy Atty. Gen., Chief, Litigation Section, Harrisburg, Pa., for appellee Frank Kroboth.
 Before SLOVITER and STAPLETON, Circuit Judges, and BROTMAN, District Judge.*
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 This is the second time this year that we must consider whether plaintiffs have pled a viable claim under 42 U.S.C. Sec. 1983 based on a jailhouse suicide. In Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir.1988), we held that in light of the allegations of the complaint and those that were proffered in the memorandum opposing dismissal, plaintiff was entitled to a reasonable amount of discovery to help her make the necessary showing to prove her case. We now must examine the allegations in this case and decide the effect of Colburn on the disposition of this appeal.
 
 I.
 The Complaint
 
 2
 Because the district court dismissed the complaint, we view the allegations in the light most favorable to plaintiff. See Estate of Bailey by Oare v. County of York, 768 F.2d 503, 506 (3d Cir.1985). The complaint alleges that at midday, on February 7, 1986, Jerry Freedman "appeared" at the Allentown Police Station and was questioned for the next two and one-half hours by defendant Carl Balliet, a detective with the Allentown Police, concerning "possible violations of the State Prescription Law." App. at 7. Freedman was arrested at about 2:36 p.m. and was placed by unidentified police officers in a cell which was isolated from the other cells and could not be readily observed by defendants, rather than in a booking cell where prisoners could be watched closely. Sometime before 3:15 p.m. that day, Freedman hung himself from the air vent grating with his shirt.
 
 
 3
 The administrator of Freedman's estate, his father Albert Freedman, filed a complaint based on 42 U.S.C. Sec. 1983 against the City of Allentown, its Chief of Police David M. Howells, Sr., Assistant Chief Gerald Monahan, Jr., Detective Carl Balliet, two individual police officers, George LaFaver and Robert Hendricks, and Frank Kroboth, Freedman's state probation officer, to which were appended various Pennsylvania tort claims. The complaint also included a claim by Albert and Estelle Freedman under section 1983 for damages they suffered as Freedman's parents.[1]
 
 
 4
 The complaint charged that Balliet and the individual officers "knew or should have known" of Freedman's "suicidal tendencies and attempts," and "knew or should have known" that Freedman "posed a significant and substantial risk of suicide ... if left unattended or in possession of items with which he could take his own life," and yet "failed to take the proper precautions concerning [his] custodial care." App. at 9.
 
 
 5
 The facts specified in the complaint to support these conclusions are that Freedman was asked by Balliet during the questioning whether he had any scars, and in response rolled up his sleeves and revealed "large prominent scars" on his wrists, the inside of his elbows, and his neck. App. at 7.[2] These scars were described post-mortem by the forensic pathologist as "suicide hesitation cuts." App. at 7. Furthermore, these scars were "readily apparent" when Freedman was "physically searched by the defendants" after his arrest. App. at 7. The complaint alleges that during the questioning period, Balliet spoke by telephone with defendant Frank Kroboth, Freedman's state probation officer, who allegedly knew but did not inform Balliet that Freedman had suicidal tendencies and had previously attempted suicide. Finally, the complaint alleges that there had been at least one attempted suicide by the manner used by Freedman in the jail, and one actual suicide. App. at 8.
 
 
 6
 The complaint alleges that the failure of the defendants to take necessary precautions to prevent suicides constituted "willful misconduct and [as] intentional and deliberate and in reckless disregard of [Freedman's] rights, not merely negligence," App. at 10; that Kroboth's failure to inform Balliet of Freedman's suicidal tendencies was intentional and in reckless disregard of Freedman's civil rights; and that there was a City policy not to institute any procedure, or any mechanical system, for the effective monitoring of detainees or prisoners with known suicidal tendencies, not to appropriate the necessary funds for adequate police training in the handling of mentally disturbed suspects, and not to train police officers.
 
 II.
 The District Court's Decision
 
 7
 Defendants filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), which the district court granted. Freedman v. City of Allentown, 651 F.Supp. 1046 (E.D.Pa.1987). The district court concluded that the complaint alleged nothing more than mere negligence on the part of the individual officers because there were no facts alleged which supported the allegation that the policemen knew or should have known of Freedman's suicidal tendencies. The court recognized that plaintiff had pled the presence of scars on Freedman's body, which it referred to as "[t]he only fact alleged which could even remotely support plaintiffs' theory" of knowledge, but stated that "there is no averment that the scars could or should have alerted the officers to Freedman's alleged suicidal tendencies, serious mental disabilities, prior hospitalizations and suicide attempts." Id. at 1048. The court stated that the complaint itself alleged that Kroboth, the one defendant who had actual knowledge of Freedman's history, failed to disclose those tendencies to the police. The averments against Kroboth, the court concluded, were insufficient to support the allegations of intentional or reckless misconduct, amounting at most to a lack of due care not actionable under section 1983. Id.[3]
 
 
 8
 The district court also held that even if the theory of inadequate training were viable as a basis for the claims against the City and supervisory personnel under section 1983, the facts alleged were inadequate to state a claim under that theory. Id. Plaintiff appeals from the court's order dismissing the complaint.
 
 III.
 Discussion
 A.
 
 9
 A claim under section 1983 must allege conduct which deprives the victim of a right or privilege secured by the Constitution or laws of the United States. See Riley v. Jeffes, 777 F.2d 143, 145 (3d Cir.1985). In order to ascertain whether a civil rights complaint is frivolous and provides adequate notice to enable the defendants to frame an answer, this court requires that the "complaint contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs." Ross v. Meagan, 638 F.2d 646, 650 (3d Cir.1981), quoted in Colburn, 838 F.2d at 666.
 
 
 10
 Our specificity rule in civil rights cases may on the surface appear to be in tension with the liberal notice pleading approach of the Federal Rules of Civil Procedure. Closer examination shows that it represents a balance between the rights of local government officials not to be subjected to the burden of trial on claims that are legally insufficient, articulated in other contexts, see Mitchell v. Forsyth, 472 U.S. 511, 526-27, 105 S.Ct. 2806, 2815-16, 86 L.Ed.2d 411 (1985); Harlow v. Fitzgerald, 457 U.S. 800, 816-18, 102 S.Ct. 2727, 2737-38, 73 L.Ed.2d 396 (1982), and the rights of plaintiffs who have been injured as a result of actions or practices which the civil rights laws are designed to redress. To effectuate the latter, we have required the district courts to permit amendments in circumstances where more specific factual allegations may reveal that the conduct in question falls within the ambit of section 1983. See, e.g., Darr v. Wolfe, 767 F.2d 79 (3d Cir.1985); Ross v. Meagan, 638 F.2d 646 (3d Cir.1981). Furthermore, when the lack of factual specificity is fairly attributable to defendants' control of required information, we have permitted the action to proceed to "a reasonable amount of discovery to help [plaintiff] make the necessary showing to prove her case." Colburn, 838 F.2d at 670.
 
 
 11
 There is no bright line rule. "Inevitably, the sufficiency of a [civil rights] complaint must be determined on a case-by-case basis." Frazier v. Southeastern Pennsylvania Transportation Authority, 785 F.2d 65, 68 (3d Cir.1986). Where we have been satisfied from the factual scenario alleged that the conduct could have violated plaintiff's rights, we have held the complaint to be sufficient. See, e.g., District Council 47, American Federation of State, County and Municipal Employees v. Bradley, 795 F.2d 310 (3d Cir.1986); Hall v. Pennsylvania State Police, 570 F.2d 86 (3d Cir.1978). Where we have concluded that the plaintiff could not allege a viable civil rights complaint, we have sustained the dismissal. See, e.g., Commonwealth Bank & Trust Co. v. Russell, 825 F.2d 12 (3d Cir.1987).
 
 
 12
 For this reason, the pleading rules cannot be divorced from the substantive requirements of a section 1983 claim. It does not advance our inquiry that plaintiffs pleaded the conclusory allegations that defendants' actions were "willful", "intentional and deliberate", and with "reckless disregard of [the victim's] rights". App. at 10. Instead, we must return to the factual scenario itself to examine whether the conduct alleged, viewed most favorably to plaintiffs, is reasonably susceptible to falling within the conclusions alleged.
 
 
 13
 Jail suicides present particularly difficult occasions for line drawing. We have held that a section 1983 claim arising from a prisoner's suicide is not per se precluded merely because the injury resulted from the prisoner's own self-destructive behavior. Colburn, 838 F.2d at 667-70. On the other hand, a prison custodian is not the guarantor of a prisoner's safety. We cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care. See Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200-01, 82 L.Ed.2d 393 (1984) (prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves"). Plaintiff's counsel has conceded that not every jail suicide presents a viable claim for violation of the prisoner's constitutional rights. The court must determine from the factual scenario pled whether the plaintiff could make out a constitutional claim rather than one for mere negligence by the custodian which might be redressed, if at all, under state law. See Estate of Bailey, 768 F.2d at 508.
 
 
 14
 Obviously, when it is averred that the individual officers themselves have taken affirmative action directly leading to the prisoner's suicide, a civil rights claim has been properly pled. See, e.g., Madden v. City of Meriden, 602 F.Supp. 1160, 1163 (D.Conn.1985) (complaint alleged police took victim from a psychiatric hospital, beat him severely, then lodged him in an unmonitored cell of such design and condition as to facilitate death by hanging); see also Jackson v. City of Chicago, 645 F.Supp. 926 (N.D.Ill.1986). Section 1983 covers more than such direct action. When facts have been pled which, if proven, would demonstrate that the prison officials actually knew of the suicidal tendencies of a particular prisoner, and ignored their responsibility to take reasonable precautions, the complaint has survived dismissal. See Matje v. Leis, 571 F.Supp. 918 (S.D.Ohio 1983) (several different prison employees failed to discover a lethal dose of drugs hidden in the inmate's person despite repeated warnings that she was suicidal and precise reports of the location of the drugs).[4]
 
 
 15
 Similarly, when the factual scenario presented by plaintiff suggests that defendants should have known that the prisoner was a suicide risk, and failed to take necessary and available precautions to protect the prisoner from self-inflicted wounds, the complaint will survive dismissal. This was the situation presented in Colburn.
 
 B.
 
 16
 Plaintiffs in this case do not allege actual knowledge by the individual police officers of Freedman's suicidal tendencies. Instead, the complaint pleads that Kroboth, the state probation officer, who knew of Freedman's prior suicide attempt, failed to mention it to Balliet. This case is therefore unlike Partridge v. Two Unknown Police Officers of Houston, 791 F.2d 1182 (5th Cir.1986), where the prisoner who committed suicide exhibited hysterical behavior on his arrest and serious aberrant behavior en route to the jail, the arresting officer was told by the prisoner's father that the prisoner had suffered a mental breakdown and was shown that he wore two medical alert bracelets, and there were jail records showing that the prisoner had attempted suicide during an earlier confinement. Id. at 1184.
 
 
 17
 Plaintiffs argue, however, that Freedman's large prominent scars on his wrists, inside of his elbows and neck were shown by Freedman to the individual defendants and were, in any event, readily apparent when Freedman was searched. Because we must view the complaint in the light most favorable to plaintiffs we will assume that a reasonably competent prison official should have known and identified these marks as "suicide hesitation cuts," as described by the forensic pathologist. Even if so, the failure to recognize them as such, without more, amounts only to negligence and therefore fails to support a claim under section 1983. See Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).
 
 
 18
 Plaintiffs seek to analogize this case to Colburn. In Colburn, however, we found a basis from the allegations pleaded and proffered to conclude that plaintiff might be able to show more than mere negligence. There, in addition to the obvious scars on the prisoner's wrists, we noted that the township's police were familiar with the prisoner and knew that on the preceding day she had jumped from a window following an argument with her boyfriend, that the detaining officer had to prevent her from swallowing three Valium pills she had removed from her purse, and that one of the police officers found a live round of ammunition in decedent's pocket while searching her. 838 F.2d at 670. These allegations, plus the fact that the suicide was by shooting with a gun that the searching officer allegedly failed to find during a search of the prisoner, who was scantily dressed in a halter and shorts, id. at 664-65, distinguished that factual scenario from the situation before us.
 
 
 19
 In the absence of any allegations suggesting more than mere negligence by the individual police officers in failing to recognize Freedman's suicidal tendencies from the scars that were readily apparent, we conclude that plaintiffs have not alleged a viable section 1983 claim against those officers. It follows that there can be no claim based on these defendants' failure to place Freedman in a special cell for prisoners known to need close monitoring. The district court, therefore, did not err in dismissing the complaint against the individual police officers.
 
 C.
 
 20
 Plaintiffs seek to maintain the action against the City and the supervisory officials on the basis of an alleged policy not to establish a procedure, system or equipment whereby the prison officials could maintain visual surveillance or otherwise monitor prisoners of known suicidal tendencies. There is not even a modicum of factual support for this claim, and indeed the complaint itself refers to the existence of "a booking cell in the Detective Bureau where prisoners can be watched closely." App. at 8. Because the failure to place Freedman in a specially monitored cell necessarily followed from the police officers' failure to identify Freedman as a suicide risk, it is the latter omission, which we have concluded alleges at most negligence, that forms the essence of plaintiffs' section 1983 claim.
 
 
 21
 Plaintiffs have also alleged a policy not to appropriately train police officers "in the lawful and effective" handling of mentally disturbed persons or not to appropriate sufficient money for adequate police training. App. at 10. Although an official custom or policy may be inferred from omissions and informal acts as well as from formal acts, see Estate of Bailey, 768 F.2d at 506; see also Jackson, 645 F.Supp. at 927-28 (discussing official and municipal liability for failing to institute anti-suicide measures), there is not even a modicum of factual support for the allegation that the city deliberately elected not to fund or carry out training.
 
 
 22
 In Colburn, we recognized that there may be circumstances in which a deficient training policy can form the basis for municipal liability under section 1983. Colburn, 838 F.2d at 672-73. However, we reiterated the statement made in Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir.1986), that such liability requires a showing of, at least, "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." Colburn, 838 F.2d at 673. Mere conclusory allegations, such as here, that the defendants deliberately elected not to train are not enough to support a constitutional claim.
 
 D.
 
 23
 The allegations against Kroboth, the state probation officer, are that Kroboth, who knew of Freedman's prior suicide attempt, failed to inform Balliet, who was then questioning Freedman, of Freedman's suicidal tendencies. It may be that a reasonably prudent probation officer, knowing that Freedman was being questioned or had been detained, would have cautioned the detaining officers about Freedman's prior suicide attempt and suicidal tendencies. We must decide, however, whether the allegations of the complaint support a possible conclusion that the failure to do so rises above negligence to a reckless indifference of Freedman's rights.
 
 
 24
 Even if Kroboth visited the jail while Freedman was detained, as plaintiffs' counsel stated at oral argument, the failure to inform Balliet or other detaining officers of Freedman's past suicide attempt is comparable to the conduct charged against the prison official in Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), who merely failed to notify other officers of a threat against a prisoner. Although the finding in Davidson that the defendant officers were at most negligent followed a trial, in its holding that such negligence did not support a section 1983 claim the Supreme Court left no doubt as to how it viewed such conduct in the context of section 1983. It stated:
 
 
 25
 Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent. Far from abusing governmental power, or employing it as an instrument of oppression, [the prison official] mistakenly believed that the situation was not particularly serious, and [another prison official] simply forgot about the note. The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.
 
 
 26
 Id. at 347-48, 106 S.Ct. at 670 (citation omitted).
 
 
 27
 Because we fail to find any factual allegation that would support the conclusion that Kroboth's conduct was more than mere negligence, we will also affirm the district court's dismissal of the complaint as to him.[5]
 
 IV.
 
 28
 The dissenting opinion's eloquent argument would, in effect, extend Colburn to apply to all jail suicides. The majority of this court has chosen to take a middle course, rejecting the contention that jail suicides can never give rise to a claim against prison officials, see Colburn, 838 F.2d at 675-85 (Garth, J., dissenting); see also Partridge v. Two Unknown Police Officers of Houston, 791 F.2d 1182, 1190-91 (5th Cir.1986) (Jolly, J., dissenting), but utilizing the pleading standard that requires a modicum of factual specificity to insure that suits based merely on conclusory allegations cannot proceed to the often burdensome discovery stage. Our difference with Judge Brotman in this case is not one of principle but merely as to the specifics of line-drawing. We view Colburn as falling on one side, and Freedman on the other.
 
 
 29
 For the reasons set forth above, the order of the district court dismissing this complaint will be affirmed. In doing so, we do not retreat from our position in Colburn that a prisoner's suicide may under certain circumstances give rise to a section 1983 claim. We hold merely that not every prisoner's suicide necessarily does.
 
 
 30
 BROTMAN, District Judge, concurring in part and dissenting in part.
 
 
 31
 In its recent Colburn decision, this court left no doubt that the Fourteenth Amendment imposes a duty on custodial officials not to act with reckless indifference to the suicidal tendencies of their detainees if they knew or should have known of their detainees' particular vulnerability to suicide. Colburn v. Upper Darby Twp., 838 F.2d 663, 669 (3d Cir.1988). It properly recognized that detainees are entitled to the same freedom from harm under the due process clause as that afforded convicted prisoners, and that this liberty interest is not sacrificed simply because the injury is self-inflicted. Id. at 668. Colburn concluded that Sec. 1983 liability can properly attach to custodial officials whose conduct with regard to their detainees rises above mere negligence, regardless of who actually committed the offending assault. Id.
 
 
 32
 Colburn, like the case presently before us, involved an appeal from a 12(b)(6) dismissal of plaintiff's complaint. Integral to the court's decision to reverse the district judge's ruling was the procedural posture of the case at the time the claims were dismissed. The litigation was still in its infancy, with no facts having been adduced other than those alleged in the "amended" complaint. In particular, with regard to the claim against Officer Miller, the police officer who conducted the search of the decedent before she was placed in her jail cell, this court stressed that plaintiff was entitled to "a reasonable amount of discovery" to assist her in making the necessary showing to prove her case. Id. at 670. The Colburn court stated unequivocally that plaintiff need do no more than merely allege the particular conduct in purported violation of the decedent's rights with a "modicum of factual specificity." Id. at 666, citing, Ross v. Meagan, 638 F.2d 646, 650 (3d Cir.1981). It concluded that plaintiff's allegations against the searching officer and those against the municipal defendants, at least with regard to the claim for inadequate monitoring and supervision, were sufficient to satisfy this threshold pleading burden. However, in the case at bar, the majority has concluded inexplicably that the plaintiffs' allegations are insufficient to withstand a 12(b)(6) dismissal, and it is here where I part company with my brethren.
 
 
 33
 I have no quarrel with the dismissal of plaintiffs' claims against Officers George LaFaver and Robert Hendricks, against whom nothing is alleged which could give rise to Sec. 1983 liability. In fact, the complaint fails to allege any personal involvement by either of these two police officers in the events surrounding Freedman's suicide. I also do not take issue with the 12(b)(6) dismissal of the claim against probation officer Kroboth whose conduct in failing to notify Detective Balliet of Freedman's prior suicide attempt, although far from commendable, was, at most, an unfortunate breach of his duty of due care. The majority's analogy to the conduct of the defendant prison official in Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), is particularly apropos. See Majority Op. at 1117. Therefore, I concur with the result reached by the majority as to these three individual defendants.
 
 
 34
 However, I find the majority's affirmance of the district court's dismissal of the claims against Detective Balliet and the municipal defendants inconsistent with this court's holding in Colburn and I must, therefore, respectfully dissent.A. DETECTIVE BALLIET
 
 
 35
 Plaintiffs' complaint alleges that Freedman was questioned by Detective Balliet for over two and one-half hours concerning possible violations of Pennsylvania's Prescription Law after his unexplained "appearance" at the Allentown Police Station. It was during this lengthy interrogation when Balliet allegedly asked Freedman whether he had any scars on his body, in response to which Freedman rolled up his sleeves and "revealed large prominent scars on his wrists and inside of his elbows and neck." See Appellants' Brief, Appendix 7a. These scars were designated post-mortem by a forensic pathologist as "suicide hesitation cuts." The complaint also alleges that these same scars were "readily apparent" on the decedent's body at the time Freedman was searched by unidentified police officers after his arrest. It is on the basis of the factual allegations stated above that plaintiffs conclude that the actions of defendant police officers "constituted willful misconduct and were intentional and deliberate and in reckless disregard of plaintiffs' decedent's rights, not merely negligence." Id. at 10a.
 
 
 36
 There can be no question that plaintiffs' conclusory allegation that defendants' conduct under the circumstances was, at minimum, "reckless" is in conformity with the legal standard recognized in Colburn for imposing Sec. 1983 liability on officials acting under color of state law. See Colburn, 838 F.2d at 669. However, the central issue confronting this court is whether the allegations in support of this conclusory statement can, as a matter of law, rise to the level of something more than mere negligence. Stated hypothetically, the relevant inquiry is whether a police officer's failure to recognize "prominent" scars on a detainee's elbows, wrists and neck can ever amount to anything more than simple negligence? The majority's answer is an unequivocal "no"; however, it offers no basis for its conclusion other than the unilluminating statement that "the failure to recognize them [the scars] as such ["suicide hesitation cuts"], without more, amounts only to negligence and therefore fails to support a claim under Section 1983 [citation omitted]."
 
 
 37
 I remain unconvinced that Detective Balliet's inability to recognize the tell-tale signs of a high suicide risk individual can never amount to "recklessness." I fail to see how the majority can be so resolute in its position without knowing the extent of the police officer's background and training in detecting suicide risks and in suicide prevention, in addition to his prior experience with prisoners who have taken their own lives or attempted unsuccessfully to do so. None of the information concerning the officer's knowledge, experience and professional competence would likely be known even to the most diligent civil rights plaintiff at the pleadings stage, and, therefore, he should be entitled to adduce such pertinent facts through discovery.
 
 
 38
 For example, discovery might reveal that Detective Balliet was a veteran police officer who had received extensive training in suicide prevention and had become well-versed in detecting the indicia of suicidal propensities. It is not unlikely that this was not the first time that such a veteran officer would have seen bodily markings similar to the ones on the decedent's body in the course of his duties, nor is it improbable that he would have come into contact with a prisoner bearing such markings who had committed or attempted to commit suicide. Surely, a reasonable jury could conclude that a police officer possessing such knowledge, training and experience acted "in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." See W. Page Keeton, Prosser and Keeton on Torts Sec. 34, at 213 (5th ed. 1984).
 
 
 39
 The majority distinguishes this case from Colburn on the ground that the amended complaint in Colburn alleged "more" than a simple failure to recognize prominent body scars as indicia of suicidal propensity. The court concluded that Colburn's pleading was sufficient to withstand 12(b)(6) dismissal because it also alleged that (1) the police had been summoned to the decedent's apartment the night before her suicide after she had jumped from a window following an argument with her boyfriend; (2) the detaining officer had to prevent the decedent from swallowing three Valium pills she had removed from her purse; (3) a police officer had found a live round of ammunition in the decedent's pocket at the time of her arrest; and (4) the decedent had used a gun to take her own life, a weapon which Officer Miller had allegedly failed to discover after searching the scantily clad prisoner. See Majority Op. at 1116. The majority's position simply begs the question: Why is the aggregation of alleged facts 1-4 above sufficient to state a claim, whereas the allegation of a failure to recognize scars as suicide marks, standing alone, is not. The majority's unhelpful response appears to be: "I know recklessness when I see it, and I just don't see it here."
 
 
 40
 Concededly, plaintiffs allegations against Officer Miller in Colburn present a stronger case for Sec. 1983 liability than do those against Detective Balliet in the case at bar. However, the weight of the evidence is not our concern here; the factfinder will make this determination at trial. We are merely called upon to assess the sufficiency of plaintiffs' Sec. 1983 complaint. As if self-evident, the majority has ruled, as a matter of law, that a police officer's failure to recognize prominent elbow, wrist and neck scars on a prisoner's body as warning signs of a suicidal risk can never amount to more than mere negligence. I cannot share the majority's conviction on this point, and strongly believe that the plaintiffs have drafted a complaint which contains the "modicum of factual specificity" required in actions brought under the civil rights statutes to state a claim for relief. Ross v. Meagan, 638 F.2d at 650. This is particularly true in a case such as this where the person whose constitutional rights have allegedly been violated is not alive to give his version of the events. See Colburn, 838 F.2d at 667.
 
 B. MUNICIPAL DEFENDANTS
 
 41
 In the case at bar, the majority affirms the district court's dismissal of both of plaintiffs' claims against the City of Allentown and its supervisory officials. Those claims allege (1) a failure to create a system of visual surveillance or monitoring of prisoners with known suicidal tendencies, and (2) a failure to adequately train their police officers "in the lawful and effective handling of mentally disturbed persons." Appellants' Brief, Appendix 10a. Finding the dismissal of these claims incongruous with the reasoning of Colburn, I must disagree with the majority's conclusion.
 
 
 42
 Plaintiffs' first claim against municipal defendants is treated by the majority in a cursory fashion, with no attempt made to explain the different result reached on precisely the same claim supported by almost identical factual allegations in Colburn. The conclusion reached by the majority is, once again, unsupported by any analysis. It states merely that "[t]here is not even a modicum of factual support for this claim." See Majority Op. at 1116. This statement is puzzling in light of this court's contrary ruling in Colburn.
 
 
 43
 In that case, the complaint alleged that the municipality and its officials had "exhibited a custom of laxity regarding the supervision and monitoring of their jail cells...." Colburn, 838 F.2d at 671. In response to defendants' argument that a "custom of laxity" regarding the monitoring of jail cells could not support municipal liability under Sec. 1983, this court expressly recognized, as the majority does here, that an "official policy" can be inferred " 'from informal acts or omissions of supervisory municipal officials.' " Id., citing, Estate of Bailey by Oare v. County of York, 768 F.2d 503, 506 (3d Cir.1985) (emphasis in original). Using this legal principle as a springboard, the Colburn court went on to hold that the allegations contained in plaintiff's pleadings were sufficient to satisfy the "modicum of factual specificity" requirement for Sec. 1983 actions. Of sole importance to the court in reaching its decision with regard to this claim was the allegation in plaintiff's complaint that the decedent's suicide had been the third such suicide in the Upper Darby jail in four years:
 
 
 44
 ... [P]laintiff has alleged that Stierheim was the third person to commit suicide while in police custody at the Upper Darby Township Police Department jail since November 1982 [citation omitted]. The two prior suicides can be viewed as providing the governing body of Upper Darby with actual or constructive knowledge of the alleged custom of inadequate monitoring of jail cells. See Partridge, 791 F.2d at 1189. In short, we cannot hold that the complaint provides no basis for finding liability against Upper Darby or its governing officials in their official capacity. Although it may be difficult for plaintiff to prove the " 'nexus between the policy.... and the infringement of constitutional rights,' " [citation omitted], we cannot say at this stage of the proceeding that such a nexus is so implausible that the complaint cannot be maintained.
 
 
 45
 Colburn, 838 F.2d at 672 (emphasis added).
 
 
 46
 Plaintiffs' allegations at bar are completely indistinguishable from those in Colburn. Plaintiffs' complaint in this case alleges that "[a]n attempted suicide in the precise manner in which the plaintiffs' decedent killed himself occurred approximately one-year prior by another detainee in the defendant jail" and that "at least one actual suicide" had occurred in the same jail at some unspecified prior time. See Appellants' Brief, Appendix at 8a. Yet, notwithstanding allegations almost identical to those in Colburn, the majority here, without explanation, finds them insufficient to withstand a motion to dismiss. I fail to perceive a meaningful distinction between the two cases on this particular claim.
 
 
 47
 The majority's parenthetical reference to the alleged existence of a special monitoring cell (the so-called "pink room") suggests that it believes that such an allegation vitiates plaintiffs' inadequate monitoring claim. See Majority Op. at 1116. We know nothing more about this special cell than its mere existence and can draw no conclusions about its effectiveness as a monitoring device at this early stage in the litigation.[1] Just as it would be improper to dismiss, on a 12(b)(6) motion, a prisoner's claim against a prison and its supervisory officials for failure to establish adequate medical facilities for the inmates simply because of the alleged existence of a prison infirmary, it is equally improper to dismiss plaintiffs' claim for inadequate monitoring and surveillance just because of the alleged existence of a special booking cell. Although the existence of such a facility might be a relevant factual consideration at trial, it is not dispositive at this stage in the litigation.
 
 
 48
 Finally, with regard to plaintiffs' claim against the municipal defendants for inadequate training of their police officers, my disagreement with the majority is a basic one. In Chinchello v. Fenton, 805 F.2d 126 (3d Cir.1986), Judge Stapleton acknowledged that this circuit has traditionally been reluctant "to infer supervisory approval of unconstitutional conduct from inaction on the part of the supervisor." Id. at 133. He observed, however, that those circuits more amenable to such a position have found liability where there was "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." Id. at 133 (footnote omitted).
 
 
 49
 In Colburn, this court more enthusiastically embraced the notion that a deficient training policy can form the basis of Sec. 1983 liability, noting that four Justices of the Supreme Court had recently agreed with this proposition in a case involving a plaintiff who asserted a claim against a municipality alleging grossly inadequate training of its police officers. Colburn, 838 F.2d at 672, citing, City of Springfield v. Kibbe, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (O'Connor, J., joined by Rehnquist, C.J., White, J. and Powell, J., dissenting from dismissal of writ of certiorari to Kibbe v. City of Springfield, 777 F.2d 801 (1st Cir.1985)) (inadequacy of police training may serve as a basis for Sec. 1983 liability where failure to train amounts to a reckless disregard of or deliberate indifference to the rights of persons within the city's domain). Applying the two-pronged Chinchello test to the facts in Colburn, this court concluded that plaintiff's pleadings lacked any allegations to support her claim of inadequate training, other than the isolated incident of Officer Miller's failure to detect the decedent's handgun after searching her at the Upper Darby jail. Colburn, 838 F.2d at 673. However, rather than simply affirming the dismissal of this claim, the Colburn court provided plaintiff with an opportunity to amend her complaint on remand to satisfy the two-pronged Chinchello standard. The court should do no less here.
 
 
 50
 I concur with the majority's conclusion that plaintiffs' complaint contains "not even a modicum of factual support for the allegation that the City deliberately elected not to fund or carry out training." See Majority Op. at 1116. However, the same was true in Colburn, and yet this court permitted plaintiff to amend her complaint to satisfy Chinchello 's two-part test. I see no cogent reason for deviating from that course in the case at bar.
 
 
 51
 In sum, I believe that the majority's opinion represents a marked and unnecessary departure from this court's decision in Colburn. In that case, this court recognized the great difficulty civil rights plaintiffs have in satisfying the court's requirement of factual specificity in their pleadings, Colburn, 838 F.2d at 667, and stated that they are "not required to provide either proof of [their] claims or 'a proffer of all available evidence' because in civil rights cases 'much of the evidence can be developed only through discovery' of materials held by defendant officials." Id. at 666, quoting, Frazier v. Southeastern Pennsylvania Transportation Authority, 785 F.2d 65, 68 (3d Cir.1986). The result reached by the majority in the case at bar renders these words hollow.
 
 
 52
 Plaintiffs have included sufficient factual allegations in support of their assertion of recklessness to move this case beyond the pleadings stage. Should no additional information emerge from discovery which would bolster plaintiffs' allegations, then this matter might be ripe for summary judgment adjudication. However, at this posture of the case, plaintiffs should be afforded the same opportunity to develop their case that the Colburn plaintiff was given, and should not be denied a federal forum for their claims simply because their factual allegations lacked volume.
 
 
 
 *
 Hon. Stanley S. Brotman, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 The complaint also included a claim against the Pennsylvania Board of Probation and Parole, which was voluntarily dismissed
 
 
 [2]
 There is no allegation in the complaint as to the particular action of LaFaver and Hendricks that form the basis of the claim as to them
 
 
 [3]
 The court dismissed plaintiffs' pendent state claims without prejudice to their assertion in the appropriate state court. Defendants state in their brief that such a suit has been filed
 
 
 [4]
 The pleading cases present issues different from those where the section 1983 suicide claims failed at trial or on motion for summary judgment for lack of more-than-negligent conduct. See, e.g., State Bank of St. Charles v. Camic, 712 F.2d 1140 (7th Cir.), cert. denied, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983); Patzig v. O'Neil, 577 F.2d 841 (3d Cir.1978)
 
 
 [5]
 In light of our disposition, we do not reach the issue whether parents of an adult decedent may maintain a section 1983 claim. See Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir.1984)
 
 
 [1]
 I note that plaintiffs' claim against municipal defendants is for their failure to establish an "effective means" of monitoring high suicide risks, and not merely for their failure to establish any means of supervision. See Appellants' Brief, Appendix 9a