OPINION OF THE COURT
FISHER, Circuit Judge.
Jean Wargo, as Administratrix of the estate of her grandson, Tristan Wargo (“Estate”), appeals from the District Court’s order granting summary judgment to Appellees Schuylkill County, Schuylkill County Prison Warden Gene Berdanier, Schuylkill County District Attorney Frank Cori, President Judge William Baldwin, and prison employees Michael Kryjakp, Lt. M. Flannery, and Lt. Scott Rizzardi. See Wargo v. Schuylkill County, et. al., No. 3:06cv2156, 2008 WL 4922471 (M.D.Pa. November 14, 2008). On appeal, the Estate argues that there were disputed genuine issues of material fact that made summary judgment inappropriate and that the District Court applied an incorrect legal standard to the Estate’s claim that the prison had deficient suicide related practices or procedures which led to Wargo’s death. We will affirm.
I.
We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.
Tristan Wargo was prescribed the pain medication Oxycontin after suffering a back injury in 2003 and subsequently became addicted to the medication. On October 28, 2004, after being taken off the medication by his physicians, Wargo took a shotgun to the pharmacy that had previously filled his prescriptions and stole $6,800 worth of Oxycontin. That same day Wargo was arrested and taken to the Schuylkill County Prison. The Prison’s receiving screening officer noted that War-go exhibited visible signs of Alcohol/Drug withdrawal symptoms. Wargo was then seen by the Prison’s physician. Wargo told the physician of his addiction to Oxycontin and also informed the physician of his allergy to the anti-depressant drug Wellbutrin.
Wargo was placed in a holding cell and officers were instracted to check him on an hourly basis because of his withdrawal symptoms. On October 30, 2004, Wargo informed corrections officers that he ingested ten to twelve Oxycontin pills which *758 he had brought into the prison. This report could not be verified because after a conversation with Lt. Flannery, Wargo did not exhibit any behavior consistent with drug use. Nonetheless, Lt. Flannery ordered that Wargo be placed on close observation, be given a suicide proof paper gown to wear in place of his standard prison jumpsuit, and that all items which Wargo could use to harm himself be taken from his cell. Additionally, Wargo was prohibited access to any sharp utensils with his meals. The next day Wargo reported to a corrections officer that he had a problem with his eye. Lt. Flannery attended to Wargo and found a staple hanging above Wargo’s eye.[1] Flannery removed the staple and Wargo received no further medical treatment with regard to this incident. Further, Wargo cut open a mattress, prompting prison officials to remove the mattress from his cell.
On November 1, 2004, Michael Kryjak, a prison counselor, determined that Wargo should be kept on close observation. While Kryjak was not a psychologist, he made this decision in his capacity as a prison counselor in accordance with prison procedures and in an abundance of caution. Over the next few days, Wargo’s privileges were gradually restored — he was given back his regular prison uniform, his mattress, and his regular meals. During this time, Wargo spoke on several occasions by telephone with his grandmother and met in person with his father and a family friend. Finally, on November 5, 2004, Kryjak determined that Wargo could be removed from enhanced correctional watch. Due to overcrowding at the prison, Wargo was moved to the E-block. This section of the prison was most often used for inmates on solitary confinement. War-go agreed to the assignment. We note that the last suicide at Schuylkill County Prison occurred nine years earlier on the E-block.
The day after Wargo was moved to E-block he was found dead, hanging by his bed sheet from an air vent located on the ceiling of his cell. In a note left in the cell, Wargo indicated that he had wanted to commit suicide since he arrived in prison and that he finally had the materials he needed to do so.
Wargo’s grandmother, as administratrix of his estate, filed this suit alleging a violation of Wargo’s civil rights pursuant to 42 U.S.C. § 1983 and the Fourth, Eighth and Fourteenth Amendments of the United States Constitution for deliberate indifference to Wargo’s medical needs and for maintaining deficient suicide prevention practices or policies which led to Wargo’s death. The Estate also brought state law claims under the Pennsylvania Wrongful Death Act and the Pennsylvania Survival Act. The District Court granted summary judgment to the defendants on Wargo’s claims under § 1983 and then dismissed the State law claims for lack of jurisdiction.
II.
The District Court had subject matter jurisdiction over Wargo’s § 1983 claims *759 pursuant to 28 U.S.C. § 1331 and exercised supplemental jurisdiction under 28 U.S.C. § 1367 over the related state law claims. We have appellate jurisdiction under 28 U.S.C. § 1291. When reviewing a District Court’s order granting a motion for summary judgment we exercise plenary review, applying the same standard utilized by the District Court to determine whether the moving party has demonstrated that there is no genuine issue of material fact. Colburn v. Upper Darby Twp., 946 F.2d 1017, 1020 (3d Cir.1991) (“Col-burn II ”).
III.
A.
On appeal the Estate argues that the District Court erred in granting the Appel-lees’ motion for summary judgment because there remained disputed issues of material fact and because the District Court applied an incorrect legal standard to the Estate’s deficient policies or practices claim.
B.
This Court established the standard for liability in prison suicide cases in Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir.1988) (“Colburn I ”). In that case we held that “if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability.” Id. at 669. The plaintiff therefore has the burden to establish three elements: (1) the detainee had a “particular vulnerability to suicide,” (2) the custodial officer knew or should have known of that vulnerability, and (3) those officers “acted with reckless indifference” to the detainee’s particular vulnerability. Colburn II, 946 F.2d at 1023.
We have stated that “a prison custodian is not a guarantor of a prisoner’s safety,” and therefore the fact that a suicide took place is not enough on its own to establish that prison officials were recklessly indifferent in failing to take reasonable precautions to protect prisoners entrusted to their care. Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir.1988).
In order to show a detainee had a particular vulnerability to suicide, the plaintiff must show that there was “a strong likelihood, rather than a mere possibility, that self-inflicted harm [would] occur.” Woloszyn v. County of Lawrence, 396 F.3d 314, 320 (3d Cir.2005) (citations omitted). It is not enough to show that the detainee fits within a category of persons who may be more likely to commit suicide. Instead, in this case, the Estate has the burden of demonstrating that Wargo himself had a particular vulnerability to suicide.
The Estate offers expert testimony to show that Wargo had a number of risk factors for suicide, including his age, the severity of the crime he committed, and his withdrawal symptoms. This evidence does not demonstrate Wargo’s particularized vulnerability to suicide. Many prison inmates are young men, many are in prison for serious offenses, and many suffer symptoms related to past drug abuse. Certainly it cannot be said that all of these individual inmates have a particularized vulnerability to committing suicide. It is the individual factors, not group characteristics, which are important in considering whether the person had a particular vulnerability to suicide.
In addition to evidence that Wargo fell into categories of persons more likely to commit suicide, the Estate offers evidence that Wargo’s behavior in the week leading up to his suicide should have alerted prison officials to his vulnerability to committing suicide. Fh’st, Wargo claimed to have taken ten to twelve Oxycontin pills that he smuggled into the prison. As a result of *760 this action, prison officials placed Wargo on watch, but they did not interpret this action as an attempt to commit suicide, considering Wargo’s addiction to the drug. In fact, given Wargo’s lack of a reaction to the drug, prison officials could not confirm that consumption in fact took place. Prison officials also did not consider the fact that Wargo cut open his mattress or the fact that a staple was pulled from his eye to be signs that Wargo was an enhanced risk of suicide.
Even drawing all reasonable inferences from the events surrounding Wargo’s time in prison in the plaintiff’s favor we cannot find that a prisoner consuming drugs he smuggled into a prison, cutting open a mattress, or putting a staple into or near his eye demonstrates his particular vulnerability to suicide. Wargo’s drug consumption would be typical of a drug addict who was able to obtain drugs in prison. Prison officials say that cutting open mattresses is a common way for inmates to stay warm and that putting a staple near one’s eye is a typical way for inmates to keep open a piercing. As the District Coux-t noted, placing a staple in or near one’s eye would be an odd way to attempt suicide. Given that these events are occur from time to time at the prison, it cannot be said that they establish a strong likelihood that the inmate will commit suicide.
Finally, those closest to Wargo did not recognize any change in his behavior that made him appear more likely to commit suicide. While incarcerated, Wargo had multiple telephone conversations with his grandmother and was visited by Joe Kraw-czyk, who was close enough with Wargo to consider himself Wax-go’s uncle. Neither repox-ted to prison officials any concern that Wax-go may tx-y to hax-nx himself. The fact that family members and close fi-iends wex-e unable to recognize that Wargo was at risk of harming himself weighs heavily against a finding that Wax-go was pax*ticu-larly vulnex-able to committing suicide.
We therefore find that the Distx-iet Coux-t did not err in granting summax*y judgment on the Estate’s deliberate indifference claim.
C.
The Estate next claims that the District Coux-t incox-x-ectly interpx-eted the Estate’s claim that the px-ison maintained deficient suicide prevention policies or practices which led to Wax-go’s death as one for failux-e to train employees. According to the Estate, this led the Distx-ict Court to apply an incorrect legal standard to the deficient policies and practices claim.
A local government entity may be held liable under § 1983 only when the plaintiff demonstx-ates that the government entity itself caused the plaintiff’s injuxy thx-ough the implementation of a policy or custom. Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We have said that a policy is an official proclamation or edict of a municipality while a custom is a practice that is so permanent and well settled as to virtually constitute law. Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.1996) (citations omitted). The plaintiff must also show that “there is a dix*eet causal link between [the] municipal policy or custom and the alleged constitutional deprivation.” Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir.2001) (quoting City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). It must be the policymaker’s actions that “directly caused constitutional harm.” Gottlieb ex. rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 175 (3d Cir.2001).
The Estate alleges that five deficient policies or practices led to Wax-go’s death: (1) not requix-ing intake staff to ask questions necessary to do a risk assessment; *761 (2) permitting an unqualified individual to be solely responsible for assessing and determining inmates mental health needs; (3) permitting an unqualified individual to remove inmates from watch precautions without consulting a psychiatrist; (4) permitting individuals who have just been taken off suicide or enhanced watch to be housed on E-Block with the means and opportunity to commit suicide; and (5) the written suicide policies were incomplete and inadequately written to protect the safety of potentially suicidal inmates.
The District Court’s opinion includes a discussion of the prison’s admissions procedures, medical and health screening policy, and a memorandum establishing prison policy for dealing with suicide threats. See Wargo, 2008 WL 4922471, at NO-12. We need not repeat that lengthy factual discussion.
As the District Court recognized, the Estate’s first two claims that the prison’s policies are deficient center around the idea that the prison should have collected more information from inmates and put that information in the hands of a more highly trained individual, and that the failure to do so led to Wargo’s death. This theory runs counter to our holding in Col-bum I that the detainee must have a “particular vulnerability” to suicide. 838 F.2d at 669. More information of the type the Estate says should have been collected from Wargo may have placed him in a category of persons more likely to commit suicide, but that is not enough to establish an individual risk. The Estate’s first two problems with the prison’s policy, therefore, do not establish that Wargo’s death came as the result of a policy or practice of the prison.
It was not the policy or practice of the prison to allow an inmate placed on suicide watch to be taken off by anyone other than a psychiatrist. The prison’s written policy required that any inmate placed on suicide watch be taken off only by a psychiatrist. In the instant case, Wargo was placed merely on observation status. There is no evidence that Wargo was ever placed on suicide watch, thus there is no evidence that he was improperly taken off suicide watch status by Kryjak. Further, the Estate offered no evidence to show that it was an established practice on the part of the prison to have a non-expert remove an inmate from close observation.
Even if Kryjak did violate prison policies by taking Wargo off of enhanced watch without consulting a psychiatrist, Wargo’s death occurred because of a violation of prison policy not because of a deficient policy or practice. Therefore, the Estate’s third item does not establish that Wargo’s death came as a result of a deficient policy or practice. Further, in addressing the Estate’s fourth argument, nothing in evidence suggests the Prison had a policy or practice of .placing individuals taken off enhanced watch or suicide watch in the E-Block.
Finally, the Estate argues that the written suicide policy itself constitutes deliberate indifference to inmate safety. The prison had a suicide policy in place in October and November 2004 requiring that inmates be screened on intake for suicidal tendencies or a history of past suicide attempts. If such a history is found then a suicide prevention and intervention program is triggered. Prison guards were given training under this policy to recognize risk factors for suicide or other serious mental health issues. Additional training was provided for front line officers, including Lieutenants Rizzardi and Flannery. No suicides took place at the prison for nine years prior to Wargo’s death.
While the Estate and its experts may raise items that could improve the prison’s suicide policies, we have held that deliber *762 ate indifference is not established simply because a better policy could have been enacted. See Colburn II, 946 F.2d at 1029-30.
We therefore hold that the Estate has not put forth any evidence of a causal link between Wargo’s death and a policy or practice of the prison.
IV.
For the aforementioned reasons, we will affirm the District Court’s order granting summary judgment to the appellees.

. There is a factual dispute as to whether the staple was actually in Wargo’s eye or whether it was above the eye. The incident report states that the staple was in Wargo's eye, but Lt. Flannery's deposition testimony states that it was actually above the eye. The resolution of this dispute is not necessary to our analysis. The Estate argues on appeal that a jury should resolve this factual dispute and that summary judgment was therefore inappropriate. Summary judgment does not require that there be no disputed facts. Instead, to grant summary judgment there must be no genuine issue of material fact, the resolution of which could allow a reasonable jury to return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).