946 F.2d 1017
 COLBURN, Sue Ann, Administratrix of the Estate of Melinda
Lee Stierheim, Deceased, Appellant,
v.
UPPER DARBY TOWNSHIP, Upper Darby Township Police
Department, Miller, Diane, Ind. and as Police Officer-Matron
of Upper Darby Township, Kern, Martin, Police Commissioner
of Upper Darby Township, and Ward, James J., Mayor of Upper
Darby Township.
 No. 90-1442.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1990.
Decided Oct. 10, 1991.
 
 Joseph R. Pozzuolo, Gary M. Perkiss (argued), Pozzuolo & Perkiss, Philadelphia, Pa., for appellant.
 Dean F. Murtagh, John P. Shusted (argued), Ellen M. Rebstock, German, Gallagher & Murtagh, Philadelphia, Pa., for appellees.
 Before STAPLETON, HUTCHINSON and GARTH, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 We are called upon again to consider the standards governing a 42 U.S.C. § 1983 action brought in the aftermath of the suicide of a pretrial detainee. Sue Ann Colburn alleges that Upper Darby Township ("Upper Darby"), its police department, and an individual police officer violated her daughter's due process rights by failing to prevent her suicide. The district court granted summary judgment in favor of the defendants. We will affirm.I.
 
 
 2
 This case has been the subject of a previously reported decision. Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) ("Colburn I "). There, we vacated the order of the district court granting defendant's motion to dismiss. Colburn returns to this court to appeal the district court's subsequent order granting summary judgment in favor of the defendants after full discovery.
 
 
 3
 We exercise plenary review and apply the same standard utilized by the district court; we review the record to determine whether the defendants, the moving parties, have demonstrated that there is no genuine issue of material fact. See Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir.1988). In order to defeat the defendants' motions, Colburn must introduce "more than a mere scintilla of evidence" showing that there is a genuine issue for trial; she must introduce evidence from which a rational finder of fact could find in her favor. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 II.
 
 4
 On April 30, 1985, Melinda Lee Stierheim ("Stierheim") fatally shot herself while in the custody of the Upper Darby police. Earlier that evening, police officers had arrested her on charges of public intoxication. Stierheim was clad in tight fitting denim cut-off shorts and a halter top. The arresting officer conducted a "pat-down" search of Stierheim, but found only keys.
 
 
 5
 Stierheim was calm and subdued during the ride to the police station. Upon arrival at approximately 5:30 P.M., police officers placed her in a holding cell while they completed the necessary paperwork. From the radio room of the station, Officer Frank Guille observed that Stierheim was looking at three blue pills she held in her hand. Officer Guille entered the cell and confiscated them. Later tests identified the pills as Valium. Officer Guille conducted a second pat-down search and discovered a bullet in the pocket of Stierheim's shorts.
 
 
 6
 At that time, defendant Diane Miller ("Miller"), arrived in the cell. Miller was the custodial officer responsible for body searches and observation of female detainees and had been called on duty specifically as a result of Stierheim's detention. Miller conducted a third search of Stierheim.
 
 
 7
 I did her waistband first. I put my fingers around her jeans, back and front. And then I did--I did her breasts and then I told her to turn around and I touched her back, okay. And I said, "Okay. I have to touch your pockets now."
 
 
 8
 And she had a little watch pocket, whatever you call it, and that's where I found a little musical charm, a note. Okay. That was in there. And then I checked her other pockets. And her pants were extremely tight, because my rings were caught. They were pulling off. And I pulled them out, and I found nothing at all. I hit her vagina and her front. That's all she had on.
 
 
 9
 App. at 84. In addition, Miller patted Stierheim around her entire body, removed Stierheim's sandals and examined her sandals and feet, and looked in her ears. Miller did observe a number of tattoos, but she did not see any scars on Stierheim's arms. Miller did not perform a strip search because Stierheim was scantily clad and was being detained for public drunkenness.
 
 
 10
 When Miller completed the third search, she and Officer Guille moved Stierheim to the first jail cell in the area designated for women. A video camera enables police to monitor all but approximately one square foot of the cell. A protruding toilet and sink obstruct the camera's view of that area. Stierheim was in view on the video screen throughout Miller's shift. In addition, Miller checked on Stierheim personally more than once every half hour.
 
 
 11
 Miller made three visits to Stierheim's cell; on one occasion she was asleep and on the other two there was conversation between Miller and Stierheim. During one conversation, Stierheim indicated to Miller that she had gotten drunk because of problems with her boyfriend. At all times during Miller's supervision, Stierheim was calm and cooperative and gave Miller no indication that she was contemplating suicide.
 
 
 12
 At 6:15 P.M. Julia Whalen ("Whalen") relieved Miller. Like Miller, Whalen was specifically responsible for supervising Stierheim. Miller told Whalen that Stierheim had been arrested for public intoxication. Whalen continued to observe Stierheim on the video monitor and to personally check on her every half hour. Shortly after Whalen went on duty, Stierheim told Whalen that she had a three year old daughter. The child was with Stierheim's mother who cared for her four days a week. Her nickname, like that of her mother, was "Mindy."
 
 
 13
 After 7:00 P.M. Stierheim became agitated and began yelling that she wanted to go home. Whalen tried to calm her. Stierheim related that she had been fighting with her boyfriend. She was being evicted from her apartment and told Whalen that she wanted to get home to get her furniture. Stierheim also revealed that she had taken one Valium pill earlier in the evening.
 
 
 14
 By 8:00 P.M. Stierheim had calmed down and Whalen permitted her to call her mother. Stierheim asked Colburn to come to the station and tell the police that "it wasn't her fault." Colburn refused and an argument ensued. Colburn's testimony regarding the remainder of the conversation was as follows:
 
 
 15
 And, then, I said I wouldn't come down, and she got angry with me and at that point we switched into an old argument, which is, "If you don't come down, all right, you'll never see the baby again." And I've heard this one before. At that point in time, I felt a little relieved, because I've heard this argument before and, you know, "you'll never see Mindy again; I'll take her away," et cetera, et cetera.
 
 
 16
 Every time she would really get angry with me, this is the argument she would throw at me.
 
 
 17
 Q. Did she specifically say, "You'll never see Mindy again?"
 
 
 18
 A. Yes, or something like that.
 
 
 19
 Q. Was it your understanding she was referring to her daughter?
 
 
 20
 A. Yes. Like I said, I've heard this argument before. This was not a new argument. The other was the part that's odd to me.
 
 
 21
 Q. And that was when she mentioned, "It's not my fault?"
 
 
 22
 A. "Come down and tell them it's not my fault."
 
 
 23
 Q. What was the tone of her conversation at the start of this telephone conversation?
 
 
 24
 A. Demanding.
 
 
 25
 Q. Demanding?
 
 
 26
 A. Yes.
 
 
 27
 Q. Did that manner change over the course of the telephone conversation?
 
 
 28
 A. No. She was, you--she was like in control of the conversation. You know, "Come down and tell them it's not my fault." And then, she got angry, because I said, "I'm not coming down."
 
 
 29
 Thus, while Stierheim said something like "You'll never see Mindy again," Colburn acknowledges that, in context, her reference was to taking her child away from Colburn. Whalen testified that this was her understanding of the conversation as well.
 
 
 30
 Whalen went back to Stierheim's cell about 8:30 P.M., a half hour after the telephone call, and found her "calm." Whalen told Stierheim that she would be released at 10:00 P.M. Shortly before Whalen made her 9:00 P.M. check, however, she heard a small "pop." When she checked on Stierheim, she found her crouched in the camera's blind spot, head down, in a pool of blood. A small handgun lay nearby. Later that evening Stierheim was declared dead.
 
 
 31
 On April 30, 1985, Upper Darby had the following relevant written policies in place pertaining to "Control of Prisoners":2. Search
 
 
 32
 A. All persons placed under arrest shall be "frisked" or "patted down" at the scene of arrest before being placed in a police vehicle for transport.
 
 
 33
 B. During or immediately after any booking procedure, all prisoners will be thoroughly searched for any weapons or any other articles which could be used in any way to harm themselves or others or with which they could do any damage to any cell area.
 
 
 34
 C. A police matron shall be in attendance at any time a female person is confined in any cell area in the Public Safety Building.
 
 
 35
 1. The police matron shall conduct all in house searches of all female prisoners.
 
 
 36
 * * * * * *
 
 
 37
 5. Prisoner Safety And Well Being.
 
 
 38
 A. All prisoners shall be granted the use of the telephone as soon as possible after arrest and upon request.
 
 
 39
 B. According to state law, the well being of all confined prisoners must be checked in person every thirty minutes by a jailer, and this information logged on the form provided.
 
 
 40
 1. The law at the [sic.] this time makes no provisions for the use of video cameras or sound monitors for this purpose.
 
 
 41
 * * * * * *
 
 
 42
 D. It shall be the responsibility of the commanding officer to see that prisoners receive immediate medical treatment when needed.
 
 
 43
 * * * * * *
 
 
 44
 F. Prisoners in custody shall not be permitted to have in their possession, any medication or prescription drugs.
 
 
 45
 1. Any medications or prescriptions drugs removed from prisoners may be administered as directed on labels after contacting the issuing physician or the police surgeon for confirmation of contents.
 
 
 46
 G. Prisoners shall be placed in video monitored cells whenever possible.
 
 
 47
 1. Sound monitoring system should be used whenever possible.
 
 
 48
 In addition to these written policies, the record reveals that pursuant to a Department directive, the jailers assigned the duty of monitoring detainees were not assigned other duties. Miller and Whalen were called to duty on April 30th solely for the purpose of monitoring Stierheim. She was the only prisoner and between cell checks in person, they watched her on the video.
 
 
 49
 Upper Darby, like other municipal police departments in Pennsylvania, sends their officers to a fourteen-week basic police training course at the Pennsylvania State Police Academy. That course includes training on how to handle intoxicated individuals, and an eight-hour segment devoted to crisis intervention. While the crisis intervention segment included some instruction on what to do with someone who is threatening suicide, neither it nor any other formal course given to Upper Darby police persons provides training in identifying potential suicide victims.
 
 
 50
 Matrons like Miller and Whalen were utilized solely for conducting searches and monitoring female detainees. With the exception of a course in CPR, matrons received only "on-the-job training" from other matrons, other police officers, and Captain Morris. This training included instructions on how to conduct various kinds of searches and how to handle intoxicated detainees. They were trained to search for drugs and anything a detainee might injure herself or others with. If a pat-down search revealed a weapon or drug, the House Sergeant would be informed, and ordinarily he would direct that a strip search be conducted. With respect to suicide, the matrons were instructed to listen for threats of self-inflicted injury and to watch for signs of emotional instability. If a detainee appeared to be emotionally upset, the matrons would talk to them in an effort to calm them down and would personally visit the cell more frequently. If a detainee were in need of medical attention, the matrons were instructed to inform the House Sergeant. Each shift had a crisis intervention officer on call who had training in handling emergency situations, including suicide.
 
 
 51
 Attempted suicides were not uncommon. In the preceding ten years, Miller remembers approximately twenty attempts, two of which had been successful. Whalen had prevented one attempted suicide during her approximately two years of service as a matron. This was the only attempt she could recall.
 
 
 52
 After high school, Whalen had received an emergency medical technician's certificate from the National School of Health Technology, a curriculum requiring approximately 1,000 hours of curriculum. Thereafter, she had attended nursing school for half a year. At the time Whalen obtained employment with Upper Darby, she was employed by the Triage Ambulance Service. Miller was a housewife prior to her employment with Upper Darby.
 
 
 53
 The booking process at the Upper Darby jail includes no formal physical or mental health screening.
 
 III.
 
 54
 The plaintiff's claim presents difficult issues because no state actor directly inflicted harm on Stierheim. Nevertheless, it is established in this Circuit that the suicide of a pretrial detainee can support a recovery in a 42 U.S.C. § 1983 action. See Colburn I, supra; see also Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir.1989); Freedman v. Allentown, 853 F.2d 1111 (3d Cir.1988).
 
 
 55
 Colburn I established the standard of liability to be applied in this circuit in prison suicide cases. There, we held that "if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." 838 F.2d at 669. Thus, a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.
 
 
 56
 To better understand Colburn I 's requirements, it is helpful to examine the lines of cases that provided the theoretical underpinnings for that decision. One principal source of support was Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Estelle involved Eighth Amendment claims alleging inadequate medical treatment. The Court held that prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit "deliberate indifference to serious medical needs of prisoners." Id. at 104, 97 S.Ct. at 291. The standard enunciated in Estelle "requires [both that there be] deliberate indifference on the part of the prison officials and [that] the prisoner's medical needs ... be serious." Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326 (3d Cir.1987) ("MCCI" ) (quoting West v. Keve, 571 F.2d 158, 161 (3d Cir.1978)), cert. denied, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).
 
 
 57
 As this Court recognized in MCCI, the concept of a serious medical need, as developed in Estelle, has two components, one relating to the consequences of a failure to treat and one relating to the obviousness of those consequences. The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death. Moreover, the condition must be "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." 834 F.2d at 347 (quoting Pace v. Fauver, 479 F.Supp. 456, 458 (D.N.J.1979), aff'd, 649 F.2d 860 (3d Cir.1981)).
 
 
 58
 In Colburn I, we recognized that a "particular vulnerability to suicide" represents a "serious medical need" and relied upon Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir.1986), one of the first decisions to recognize the applicability of Estelle's analysis to detainee suicide cases. As Judge Wisdom's opinion for the court in Partridge observed,[The due process clause imposed on the custodial officials] a duty, at a minimum, not to be deliberately indifferent to Partridge's serious medical needs. A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills. A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies. And just as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care absent an intervening legitimate government objective, failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation....
 
 
 59
 Id. at 1187 (quoted in Colburn I, 838 F.2d at 669).
 
 
 60
 In Colburn I, we also found support for our holding in a line of cases concluding that a detainee has a liberty interest in his or her personal security and that a due process violation occurs when a detainee is injured by a fellow detainee as a result of a custodian's "deliberate or reckless indifference" to the victim's safety. See, e.g., Davidson v. O'Lone, 752 F.2d 817 (3d Cir.1984) (in banc), aff'd sub nom., Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Once again we referred with approval to Judge Wisdom's opinion in the Partridge case:
 
 
 61
 The principal theory of the complaint in Partridge was that the boy's death was "caused by the detention center's custom or policy of allowing jail procedures that are callous to the point of deliberate indifference to detainees, especially detainees in need of protection from injuring themselves or others." Id. at 1185. The court held that "to the extent that the claim rests on the detention center's deliberate and systematic lack of adequate care for detainees, it alleges the kind of arbitrariness and abuse of power that is preserved as a component of the due process clause in Daniels [v. Williams, [474 U.S. 327], 106 S.Ct. 662 [88 L.Ed.2d 662] (1986) ]." Id. at 1187.
 
 
 62
 Colburn I, 838 F.2d at 669.
 
 
 63
 Informed by Estelle, Davidson and their progeny, we fashioned the standard of Section 1983 liability in detainee suicide cases. In the course of doing so, we recognized that neither the due process clause with its focus on "arbitrariness and abuse of power" nor the Eighth Amendment with its focus on the "unnecessary and wanton infliction of pain" imposes liability for a negligent failure to protect a detainee from self-inflicted injury. A higher level of culpability, one involving "reckless or deliberate indifference," is required. We have so held on two occasions since Colburn I. See Williams v. Borough of West Chester, supra; Freedman v. Allentown, supra.
 
 
 64
 In Colburn I, we referred to "reckless indifference" as the standard for judging the defendant's conduct. 838 F.2d at 669. In Williams, we referred to "deliberate indifference." 891 F.2d at 464. Both panels expressly declined to distinguish or precisely define these two concepts. We find it unnecessary to do so in this case. It will suffice for present purposes to note that a level of culpability higher than a negligent failure to protect from self-inflicted harm is required and that this requirement is relevant to an evaluation of the first two Colburn I elements as well as the third.
 
 
 65
 The requirement of a "particular vulnerability to suicide" speaks to the degree of risk inherent in the detainee's condition. As several of our sister circuits have recently pointed out, the requirement of "reckless or deliberate indifference" implies that there must be "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." See, e.g., Torraco v. Maloney, 923 F.2d 231, 236 (1st Cir.1991); Popham v. City of Talladega, 908 F.2d 1561, 1563 (11th Cir.1990).
 
 
 66
 Even where a strong likelihood of suicide exists, it must be shown that the custodial officials "knew or should have known" of that strong likelihood. As the latter portion of this phrase from Colburn I indicates, it is not necessary that the custodian have a subjective appreciation of the detainee's "particular vulnerability."[1] Nevertheless, there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide.
 
 
 67
 Freedman v. City of Allentown, 853 F.2d 1111 (3d Cir.1988), illustrates the point. Jerry Freedman committed suicide while being detained in the Allentown Police Station. There was no allegation of "actual knowledge by the individual police officers of Freedman's suicidal tendencies." Id. at 1115. Rather, the plaintiffs relied on Colburn I and alleged that the defendants "should have known" that Freedman had a particular vulnerability to suicide.
 
 
 68
 The plaintiffs based their theory on the "large prominent scars" that Freedman showed the defendants "on his wrists, inside of his elbows and neck." Id. at 1116. The court was willing to assume "that a reasonably competent prison official should have known and identified these marks as 'suicide hesitation cuts,' as described by the forensic pathologist." Id. Nevertheless, the court dismissed the plaintiffs' claim because the allegations, if true, amounted only to negligence. "In the absence of any allegations suggesting more than mere negligence by the individual police officers in failing to recognize Freedman's suicidal tendencies from the scars that were readily apparent, we conclude that plaintiffs have not alleged a viable section 1983 claim against those officers." Id.
 
 
 69
 Thus, "should have known," as used in Colburn I, is a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts. It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk. The "strong likelihood" of suicide must be "so obvious that a lay person would easily recognize the necessity for" preventative action, MCCI, 834 F.2d at 347; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.
 
 IV.
 A. Diane Miller's Individual Liability
 
 70
 Colburn maintains that Diane Miller knew or should have known of Stierheim's particular vulnerability to suicide and that Miller acted with deliberate indifference to that vulnerability by failing to conduct a strip-search of Stierheim.[2] Colburn alleges that Miller's deliberate indifference caused Stierheim's death. She concludes that Miller violated Stierheim's due process rights.
 
 
 71
 On remand from Colburn I, discovery was conducted and the record significantly developed. This process explained away or undermined many of the pleaded facts upon which this Court relied in Colburn I in finding for Colburn and reversing the district court's order of dismissal. Colburn alleged, for example, that the Upper Darby police knew that on the day before committing suicide, Stierheim jumped from a window following a fight with her boyfriend. On its face, this allegation appeared to suggest a suicide attempt and in ruling on the motion to dismiss, we interpreted it in that manner. Discovery, however, revealed that Stierheim had fled through a window to a ledge immediately below that window to escape her boyfriend. The ledge was about ten feet off the ground, and Stierheim made no threat to jump. When the police arrived, they offered to help her down and she accepted. If anything, this incident is indicative of an inclination toward self-preservation and in no way evidences a particular vulnerability to suicide.
 
 
 72
 Based on the developed record, the district court concluded that Colburn failed to present evidence from which a jury could reasonably conclude that Miller knew or should have known that Stierheim suffered from a particular vulnerability to suicide and that without such evidence, Miller's failure to conduct a more intrusive search could not be found to be a due process violation. We agree.
 
 
 73
 Viewing the record in the light most favorable to Colburn, a trier of fact could rationally conclude that Miller knew the following facts: Stierheim was intoxicated, she had had an argument with her boyfriend, she had tried to ingest three pills, and a bullet had been found and removed from her pocket. The only other evidence arguably helpful to Colburn with respect to her claim against Miller is the following observation in a portion of the coroner's report entitled "External Description":
 
 
 74
 The right lower forearm on the anterior aspect shows remote faint transverse incised scars showing evidence of suturing. A prominent vertical scar is present on the ulnar[3] border of the lower right forearm.
 
 
 75
 Colburn testified that Stierheim had once attempted suicide years earlier while in high school and a rational trier of fact might infer that the "remote faint transverse incised scars" were a result of that attempt. The record establishes, however, that these scars were not noticed by anyone on the evening of April 30, 1985.
 
 
 76
 Notable by their absence from the record are any indications that Stierheim had ever been diagnosed as suffering from a mental illness characterized by a high risk of self-inflicted harm or that Miller was or should have been aware of anything else in Stierheim's past suggesting that she had a particular vulnerability to suicide.
 
 
 77
 In support of her argument, Colburn presented expert testimony that intoxication is one of the most "serious red flags" in jailhouse suicides. App. at 139. However, while the expert insisted that all detainees under the influence of alcohol "have got to be considered high risk candidates for suicide" (NT 135-36), the expert offered no data that would enable a trier of fact to assess the suicide risk presented by an intoxicated detainee. His testimony included a reference to a survey reporting that two-thirds of all prison suicides are intoxicated upon admission, but he also indicated that approximately two-thirds of all who are admitted are intoxicated. The record contains no data with respect to the percentage of intoxicated detainees who commit suicide or the percentage of suicides in the general population.
 
 
 78
 On this record, we are unwilling to equate intoxication on the part of a person taken into custody with "a particular vulnerability to suicide." Nor are we prepared to permit a jury to conclude that a custodian who fails to predict a suicide attempt from a detainee's intoxication is deliberately indifferent to the detainee's welfare. Our view is consistent with that taken by other courts of appeals which have refused to recognize intoxication as a factor sufficient to trigger the duty to guard against self-inflicted injury. See, e.g., Belcher v. Oliver, 898 F.2d 32, 33 (4th Cir.1990) ("officers had no absolute duty to protect Belcher from harming himself merely because he was intoxicated, where they had no reason to believe that his intoxication would lead to harm which was self-inflicted"); Burns v. City of Galveston, 905 F.2d 100, 104 (5th Cir.1990) (treating § 1983 action arising from suicide of intoxicated detainee as claim that detainees have general entitlement to "medical-psychological screening procedures"); State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir.) (where defendant police officers knew that decedent was intoxicated and uncooperative, court found "no question of material fact as to whether the defendants had knowledge of, or even any particular reason to suspect, suicidal tendencies on the part of [decedent]"), cert. denied, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983).
 
 
 79
 Moreover, we reject Colburn's suggestion that Stierheim's possession of an undischarged bullet provides the additional factor necessary to make her vulnerability to suicide obvious. Miller testified that Stierheim was not the first detainee to have possession of a single bullet, and, as a result, she gave that fact little thought. Without more, possession of a bullet, even by an intoxicated detainee, does not suggest suicidal tendencies.[4]
 
 
 80
 Nor are we impressed by the fact that Miller apparently believed Stierheim attempted to swallow three pills shortly before Miller arrived at the station. Although we recognize that an attempt to swallow large amounts of drugs might conceivably manifest suicidal intent, we do not believe that an attempt to take three pills is enough to make it apparent that a detainee is on the verge of suicide.
 
 
 81
 In short, Colburn has failed to "adduce more than a mere scintilla of evidence in [her] favor." Williams, 891 F.2d at 460. We are convinced that no fair-minded jury could conclude on this record that Stierheim had a particular vulnerability to suicide of which Miller should have been aware. "Only an exercise in impermissible judicial hindsight could justify holding [Miller] responsible for [Stierheim's] suicide." Belcher, 898 F.2d at 35. This we refuse to permit. We will affirm the order of the district court granting summary judgment in favor of Diane Miller.
 
 B. Municipal Liability
 
 82
 As we understand Colburn's argument, she seeks to hold Upper Darby liable on two distinct theories. She first attacks its policy regarding the treatment of arrested persons who are intoxicated. Second, Colburn alleges that Upper Darby violated her daughter's rights by failing to "adequately train its officers in identification and prevention of possible suicides." Appellants Brief at 30. She argues that this lack of training after two suicides and at least twenty attempts during the past ten years at the Upper Darby jail "constituted an official policy of indifference to the medical needs and psychological needs of suicidal detainees that violates" § 1983. Id.
 
 
 83
 A municipality is liable under § 1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation. Monell v. New York City Dep't of Social Services, 436 U.S. 658, 691-95, 98 S.Ct. 2018, 2036-38, 56 L.Ed.2d 611 (1978). Liability will be imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the "moving force" behind the constitutional tort of one its employees. Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Liability cannot be predicated, however, on a theory of respondeat superior or vicarious liability. Monell, 436 U.S. at 693-94, 98 S.Ct. at 2037.
 
 
 84
 In City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the plaintiff claimed that her constitutional rights had been violated when she was denied medical care while detained in a municipal jail. The Court noted that the relevant city policy did not itself violate Harris' constitutional rights, but held that this did not resolve her failure to train claim:
 
 
 85
 There can be little doubt that on its face the city's policy regarding medical treatment for detainees is constitutional. The policy states that the city jailer "shall ... have [a person needing medical care] taken to a hospital for medical treatment, with permission of his supervisor...." App. 33. It is difficult to see what constitutional guarantees are violated by such a policy.
 
 
 86
 Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on respondeat superior. The claim in this case, however, is that if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train....
 
 
 87
 With respect to Harris' failure to train claim, the Supreme Court held that municipal liability can be predicated upon a failure to train only where that failure amounts to "deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." 489 U.S. at 388, 109 S.Ct. at 1204. In the following passages, the Court explained the basis for the requirement of deliberate indifference and the relationship between liability for failure to train and the rule that a municipality is accountable only for its own custom or policy:
 
 
 88
 Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality--a "policy" as defined by our prior cases--can a city be liable for such a failure under § 1983.
 
 
 89
 * * * * * *
 
 
 90
 It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need....
 
 
 91
 489 U.S. at 389, 390, 109 S.Ct. at 1205, 1205.
 
 
 92
 In addition, City of Canton teaches that to sustain a claim based on a failure to train theory, "the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury." Id. at 391, 109 S.Ct. at 1206. The Court stressed that the plaintiff was required to "prove that the deficiency in training actually caused [the constitutional violation, i.e.] the police [custodian's] indifference to her medical needs." Id.
 
 
 93
 1. The Policy Regarding The Treatment Of Intoxicated Arrestees
 
 
 94
 The record discloses that persons arrested in Upper Darby in an intoxicated condition are: (1) frisked on arrest, (2) searched at the station, (3) relieved of drugs, weapons and other personal belongings that could pose a hazard to themselves and others, (4) provided with medical treatment where the need is apparent, (5) held in a jailhouse cell until they attain sobriety or until a family member takes custody, (6) surveilled constantly by close circuit TV, and (7) visited at least every half hour by a custodial officer.
 
 
 95
 Colburn's expert faulted this policy by insisting that all intoxicated detainees should be detained in a detoxification center or, failing that, that they be placed in a detention cell under constant "eyeball to eyeball" scrutiny. In either event, Colburn argues, Stierheim would have been observed with the gun before she had an opportunity to use it on herself.
 
 
 96
 We find Upper Darby's policy with respect to detainees indistinguishable from the comparable policy of the City of Canton. They were kept under observation and if they appeared to need professional treatment, it was provided. We know of no authority suggesting that a failure to hold intoxicated detainees, a class constituting two-thirds of the detainee population, in an institution devoted specifically to detoxification or to subject them to around-the-clock personal surveillance constitutes deliberate indifference to a serious need of such detainees.
 
 
 97
 2. Failure To Train In The Identification And Treatment Of Suicidal Detainee
 
 
 98
 With respect to the policy of Upper Darby relating to the identification and treatment of suicidal detainees, we first note that the record would not support a finding of a lack of training in the care of identified suicidal detainees that was causally related to Stierheim's death. Such limited evidence as there is in the record on this subject indicates that the Upper Darby jail had personnel trained to handle situations where a detainee threatens or attempts to commit suicide. Moreover, even if a deficiency in the training in this area had been identified by Colburn, she would not have shown that any such deficiency had anything to do with her daughter's being able to shoot herself in her cell.
 
 
 99
 This leaves for consideration Colburn's claim based on Upper Darby's alleged failure to train its personnel to identify potential suicide victims. In support of this claim, Colburn tendered reports from two experts and the deposition of one of them. The report of the first expert contains the following statement of his views:
 
 
 100
 UDPD failed completely to formally train its staff in signs and symptoms of suicide, suicide prevention and in handling intoxicated arrestees. All standard-setting agencies recommend this training:
 
 
 101
 a. CALEA Standard 72.7.7, 1983
 
 
 102
 b. ACA 2-5271, 1981
 
 
 103
 c. NSA Training Manual, pp. 513-28
 
 
 104
 d. AMA 120.
 
 
 105
 Depositions of police matrons bear out the total lack of formal training in the above, crucial areas. Had formal training been conducted, officers/matrons would have recognized the following as suicidal signs and symptoms:
 
 
 106
 a. Intoxication/under the influence (one of the most serious "red flags")
 
 
 107
 b. Statement by Ms. Stierheim to her Mother and heard by the matron that "You'll never see Mindy again," (automatically requires being placed on suicide watch).
 
 
 108
 c. Emotionally charged statement that "if you had a boyfriend like mine, you would get drunk" signifying high anxiety.
 
 
 109
 d. Agitation, yelling repeatedly about being released. (emphasis in original)
 
 
 110
 In his deposition, this expert testified that such training should include instruction to take all suicide threats seriously, as well as information concerning the impact of intoxication on suicide risks. The record does not contain the references cited in the expert's report and he does not elaborate further on the training he maintains should have been given. There is no evidence that any officer or employee of Upper Darby was aware of the references cited in the expert's report.
 
 
 111
 The report of Colburn's first expert also recommends that there should be "health screening upon admission for both medical and mental health reasons" and Colburn's second expert opined:
 
 
 112
 As a matter of standard operating procedure all arrestees should be subjected to a thorough and systematic intake process, which includes careful screening for medical and psychiatric problems predictive of possible suicidal potential. Such initial screening should be conducted only by thoroughly trained institutional personnel.
 
 
 113
 The record does not further describe "the health screening" or "the careful screening ... predictive of possible suicidal tendencies."
 
 
 114
 City of Canton teaches that municipal liability for failure to train cannot be predicated solely on a showing that the City's employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury. A § 1983 plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur. In a prison suicide case, this means that the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives. We conclude that Colburn has not come forward with evidence that satisfies either of these requirements.
 
 
 115
 As Colburn's expert acknowledged, at the time of her arrest and up through the time of her booking, Stierheim's "only real suicidal tendency or symptom was her intoxication." Rowan Dep., p. 225. The only subsequently arising "suicidal symptoms" that the expert could identify were her "Mindy" statement that was regarded by her mother as non-extraordinary, her comment that she became intoxicated because of her boyfriend, and her yelling at some point after 7:00 P.M. that she wanted to go home. Accordingly, to be successful, Colburn would have to identify specific training measures that could reasonably have been expected to cause Stierheim's custodians to recognize in her intoxication and these three statements that she was suicidal. Colburn, however, has not identified specific training that could reasonably be expected to single Stierheim out as being particularly vulnerable to suicide. Whether the unspecified "careful," "predictive" screening or the unspecified additional information about the relationship between intoxication and suicide would have prevented this tragedy are matters about which one can only speculate on this record.
 
 
 116
 Moreover, it is important in this context to stress that Upper Darby's policy was not unmindful of the risk of detainee suicide; nor did its training program fail to communicate to its custodians the importance of suicide prevention. Everyone associated with the jail knew that the City's policy was to take away from a detainee items she could use to inflict injury, to maintain constant video surveillance, to make frequent personal contact, and, if a suicide threat or attempt occurred, to prevent it from happening. Indeed, the custodians' implementation of the municipal policy appears to have been relatively efficacious, having thwarted in the last ten years 18 of 20 detainees who had determined to take their own lives. This is the baseline with respect to which those responsible for the content of the training program must be judged when one asks whether they can be found to have been deliberately indifferent to detainee suicides. When evaluating the magnitude and obviousness of the risk involved, the relevant risk is not the suicide risk in the absence of a prevention program but the additional reduction in suicide risks that would have been occasioned by the addition of the proposed training. Given the prevention program that was in place in Upper Darby, nothing said by Colburn's experts would justify a trier of fact in concluding that those responsible for the content of the training program were deliberately indifferent to detainee suicides.
 
 
 117
 Because Colburn's evidence does not identify specific training measures that could reasonably have been expected to single Stierheim out as particularly vulnerable to suicide and because that evidence fails to provide a basis for finding deliberate indifference on the part of those responsible for the training program of Upper Darby's custodians, we will affirm the summary judgment entered for the City on Colburn's failure-to-train claim.
 
 V.
 
 118
 We must remain mindful of Colburn I's admonition that we cannot place municipalities and their custodial officers and employees "in the position of guaranteeing that inmates will not commit suicide." 838 F.2d at 669. We will affirm the district court's summary judgment.
 
 
 
 [1]
 Custodians have been found to "know" of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities. See, e.g., Buffington v. Baltimore County, 913 F.2d 113 (4th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991); Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir.1986)
 
 
 [2]
 It is the opinion of Colburn's expert that Stierheim's gun was in all likelihood secreted in her groin area or the small of her back, and Colburn faults Miller as well for failing to probe these areas more thoroughly. Even if a trier of fact might rationally infer from this record negligence on the part of Miller in the manner in which she conducted her pat-down search, we conclude that an inference of deliberate indifference to Stierheim's welfare could not properly be drawn
 
 
 [3]
 Pertaining to the ulna, "the bone of the little-finger side of the forearm...." Webster's Ninth New Collegiate Dictionary 1279 (1985)
 
 
 [4]
 At times, Colburn appears to argue that Miller had a duty to conduct a strip-search even in the absence of evidence that Stierheim had a particular vulnerability to suicide. If Stierheim's custodian understandably perceived her as presenting no exceptional risk of suicide, however, we believe a jury under the facts of this case could not find Miller's failure to do a more intrusive search negligence, must less reckless or deliberate indifference. We are aware that Colburn's expert testified that Miller's failure to conduct a strip search constituted "deliberate indifference." It is clear from this and other portions of his deposition, however, that he was using this phrase in a different way than this court used it in Colburn I, Williams, and Freedman