

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-25-2002

# Serafin v. Johnstown

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-1281

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Serafin v. Johnstown" (2002). *2002 Decisions.* Paper 766.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/766

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 02-1281

_____

JOSEPH A. SERAFIN;
CARMELLA SERAFIN,
Representative of Joseph A. Serafin

v.

CITY OF JOHNSTOWN;
ROBERT HUNTLEY, Superintendent

Carmella Serafin, on behalf
of Joseph A. Serafin,
                              Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-cv-00232
District Judge: The Honorable D. Brooks Smith, Chief Judge

_____

Submitted Under Third Circuit LAR 34.1(a)
November 19, 2002

_____

Before: BARRY, AMBRO, <u>Circuit Judges</u>, and ACKERMAN,[*] <u>District Judge</u>

(Opinion Filed: November 25, 2002)

_____

[*] The Honorable Harold A. Ackerman, United States District Judge for the District of
New Jersey, sitting by designation.

---

OPINION

---

BARRY, <u>Circuit Judge</u>

Appellant Joseph A. Serafin, by his mother, Carmella Serafin, as his personal representative, brought this action under 42 U.S.C. § 1983 asserting violations of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. The District Court entered summary judgment in favor of defendants, and Serafin timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and will affirm.

**I.**

Because the parties are familiar with the facts of the underlying dispute, we will discuss them only as necessary to resolve the issues presented.

At 9:15 on the night of December 23, 1995, Joseph Serafin was arrested for public intoxication by City of Johnstown Police Officer Barney Soloman. Serafin was taken to a hospital emergency room, treated for a laceration on his lip, and then discharged into police custody, with instructions that he should be maintained on a "suicide watch while in jail." (App. at 47-52, 84.) After Serafin was put in his cell, Soloman advised the records clerk, Michelle Ciotti, "to keep a careful eye on him" because he was suicidal. (App. at 53, 56, 64, 71-72.) As far as Ciotti understood, this meant not to watch him "continuously," but to monitor him while answering the phone and looking at other inmates. (App. at 65-66.) At approximately 11:30 p.m., Serafin hanged himself with his shirt from the bars of

2

his cell. Ciotti switched the channel of the monitor to look at his cell and saw him hanging by his neck. She immediately called for help, and within a minute, a passing officer was inside Serafin's cell, trying to revive him. Although Serafin survived, he suffered brain damage.

**II.**

Our review is plenary. Public Interest Research of N.J. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991). In reviewing the District Court's grant of summary judgment, we must view the facts in the light most favorable to appellant and affirm only if there is no genuine issue as to any material fact and appellees are entitled to judgment as a matter of law. Anderson v. Consol. Rail Corp., 297 F.3d 242, 247 (3d Cir. 2002).

As a preliminary matter, we must observe that any liability Ciotti may have for her own actions is not at issue, since Serafin sued only the City and its Chief of Police, Robert Huntley. Defendants cannot be liable in a section 1983 suit for a constitutional violation by an employee under a *respondeat superior* theory simply because they employed him or her. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). The City and Huntley can be liable under section 1983 only if they caused an employee to violate another's constitutional rights, through execution of an official policy or settled informal custom. See id. at 691-94.

The Eighth and Fourteenth Amendments impose upon prison officials a duty to address the serious medical needs of a pretrial detainee, including psychiatric needs.

3

Colburn v. Upper Darby Township (Colburn I), 838 F.2d 663, 668-69 (3d Cir. 1988). If

prison officials know of a particular detainee's vulnerability to suicide, they may not be

deliberately indifferent to that vulnerability. See Simmons v. City of Philadelphia, 947

F.2d 1042, 1064 (3d Cir. 1991); Williams v. Borough of West Chester, 891 F.2d 458, 464

(3d Cir. 1989).

Although we have held in the past that this obligation devolves on prison officials if

they know or objectively should know that an inmate is particularly vulnerable to suicide,

Colburn I, 838 F.2d at 669, we have since adopted a subjective test for Eighth Amendment

deliberate indifference claims in prison conditions cases, in light of Farmer v. Brennan,

511 U.S. 825 (1994).[1] Consequently, in determining whether a prison official has shown

deliberate indifference to inmate health or safety, we look to what a prison official actually

knew rather than to what a reasonable official in his or her position should have known.

Beers-Capitol v. Whetzel, 256 F.3d 120, 131 (3d Cir. 2001). Actual knowledge may be

proven by circumstantial evidence if an excessive risk to inmate health or safety was so

obvious that an official must have known about it.[2] Id. at 133. Such evidence is not

conclusive, however; officials may still prove that they were unaware of even an obvious

---

[1] We have also in the past alternately referred to this level of care – or lack of care – as "reckless indifference" or "deliberate indifference." Colburn v. Upper Darby Township (Colburn II), 946 F.2d 1017, 1024 (3d Cir. 1991). In light of Farmer, however, it seems preferable to use the term "deliberate indifference" exclusively.

[2] The due process rights of pretrial detainees are at least as great as those of a convicted prisoner. Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

4

risk to inmate health or safety. Farmer, 511 U.S. at 844. Moreover, officials may also escape liability "if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Thus, in order to survive summary judgment on a deliberate indifference claim, a plaintiff must present sufficient evidence to support the inference that the defendants "knowingly and unreasonably disregarded an objectively intolerable risk of harm." Beers-Capitol, 256 F.3d at 132. This is a high hurdle. In the context of this case, in which Serafin alleges liability on the basis of inadequate policies, he must show, for each policy, that: (1) the policy or practice created an unreasonable risk of Eighth Amendment injury; (2) the City was aware of that risk; (3) the City was indifferent to the risk; and (4) his injury resulted from the policy or practice. This four-part test may be satisfied by showing either that the City failed to respond adequately to a pattern of past occurrences of injuries like Serafin's, or that the City failed to respond adequately to a great and obvious risk of constitutionally cognizable harm. Id. at 136-37. Because there is insufficient evidence in the record of past suicide attempts to demonstrate a pattern, the relevant standard is the latter.

### III.

Serafin alleges that the City demonstrated deliberate indifference in at least three ways: first, by implementing an inadequate policy of monitoring pretrial detainees at risk for suicide; second, by relying on defective video equipment to monitor such detainees; and

5

third, by inadequately training its staff to properly execute its policy regarding monitoring potentially suicidal detainees.

## A.

First, Serafin contends that the City's policies with regard to monitoring pretrial detainees believed to be suicidal evidences deliberate indifference to their safety. According to the Police Department's written policy, a prisoner known to be at risk for suicide must be monitored every five minutes. If the prisoner has attempted suicide in the past, he must be monitored continuously. Huntley testified, however, that the prison's unwritten policy has been that an officer continuously monitors a prisoner identified as a suicide risk until a mental health professional arrives. Because prison officials knew that the mental health professionals would not perform an assessment of prisoners at risk for suicide while the prisoners were intoxicated, they relied on video-monitoring such prisoners, in accordance with the written policy. "Continuous monitoring" meant "as frequently as possible given the Records Clerk's other duties." (App. at 281.) These duties were chiefly answering the phone and doing paperwork. If doing paperwork interfered with monitoring, however, it could be finished later.

There is little doubt that the City could have implemented a more stringent monitoring policy: it could have required clerks to monitor detainees to the exclusion of their other duties and even arranged for a substitute clerk if the first clerk needed to use the restroom. The fact that the City's policy was not the most effective policy possible, however, does not, without more, create an unreasonable risk to detainees' safety or

demonstrate the City's indifference to such a risk, and there is no "more" here.

Additionally, Serafin came forward with nothing to suggest that the prison considered and rejected other more effective measures of suicide prevention nor anything to suggest that they should have considered other measures where there was little evidence of any past suicide attempts much less a pattern of any such attempts. In sum, Serafin has not shown that the City's monitoring policy demonstrated deliberate indifference to the safety of pretrial detainees at risk for suicide.

**B.**

Second, Serafin argues that the City's reliance on defective video equipment to monitor pretrial detainees at risk for suicide demonstrated deliberate indifference to their safety. The video monitor trained on Serafin's cell had a history of problems; it had been repeatedly fixed in response to complaints of blurriness.

Because the City relied on the use of a monitor to watch the activities of intoxicated detainees at risk for suicide, the adequacy of these monitors was critical. The record indicates, however, that the City repeatedly repaired the monitor in question in response to complaints. Moreover, even if the City had not promptly arranged for those repairs, the monitor still functioned adequately for a clerk to observe most signs of distress. At worst, then, the record demonstrates negligence on the City's part, and negligence is simply not enough. Consequently, Serafin has not met the heavy burden of demonstrating deliberate indifference vis-a-vis the video equipment.

**C.**

Finally, Serafin challenges the City's practice of using untrained personnel with other duties to monitor intoxicated pretrial detainees at risk for suicide. As noted above, whether or not Ciotti in fact continuously monitored Serafin is not relevant to the City's liability, because its liability cannot be predicated on *respondeat superior*. Nevertheless, the training she received regarding monitoring potentially suicidal pretrial detainees is relevant evidence of the actual training practices.

Ciotti had been instructed "dozens of times" that she was obligated to monitor detainees at risk for suicide. (App. at 61-62.) When she was told that Serafin was at risk for suicide, she understood that she was expected to monitor his cell "closely." (Id. at 194-95.) She knew that she could closely monitor Serafin while sitting at a desk directly in front of the screen, while simultaneously performing her other duties, such as answering the phone and monitoring the three other cells. She was also aware that if she had trouble keeping a suicide watch on one cell while performing her other tasks, she could finish the paperwork later. Huntley similarly testified that the City had a practice of alerting clerks to those detainees at risk for suicide and of the need to monitor them continuously.

Serafin points out that the record does not show that clerks assigned to suicide watch were offered formal training in recognizing the verbal and behavioral clues of a potential suicide. Given the evidence of the City's other safeguards, however, the absence of formal training in recognizing warning signs neither creates a great and obvious risk of constitutionally cognizable harm nor demonstrates the City's indifference to such a risk. Consequently, Serafin has not demonstrated that the City's training of its clerks on suicide

8

watch indicates deliberate indifference to the safety of pretrial detainees.

**IV.**

For the foregoing reasons, we will affirm the judgment of the District Court.


TO THE CLERK OF THE COURT:

Kindly file the foregoing Opinion.


                                                    /s/    Maryanne Trump Barry
                                              Circuit Judge